[L. A. No. 2141.    In Bank.—April 21, 1909.]

JOHN H. BARTON et al., Appellants, v. RIVERSIDE WATER COMPANY, RIVERSIDE HIGHLAND WATER COMPANY, and WEST RIVERSIDE 350-INCH WATER COMPANY, Respondents.

WATER-RIGHTS—PUBLIC USE—ARTESIAN SUPPLY—ACQUIESCENCE OF PLAINTIFFS—INJUNCTION NOT ALLOWED.—When the defendant Riverside Water Company had for many years taken water for

public use and carried the same to the city of Riverside for sale and distribution to its inhabitants, and upon failure of its first supply, developed further necessary water in an artesian belt, beginning about nine years before the commencement of this action, and after a sufficient supply was thus finally developed at large expense, and the plaintiffs knew of such source of supply and made no objections or protest against the same until this action was commenced for an injunction, the injunction must be refused.

ID.—GENERAL RULE—PROPERTY TAKEN FOR PUBLIC USE—FAILURE TO OBJECT—CHANGE OF CONDITIONS—INJUNCTION—DAMAGES.—Where one whose property is taken for public use has stood by without objections, knowing that it was so taken and applied, and has allowed the public use to be instituted and carried on at great expense and has permitted the people benefited thereby to adapt themselves to new conditions and to avail themselves of the conveniences and advantages thereby afforded, he cannot thereafter maintain an action to enjoin the continuance of such public uses or to recover possession of the property so taken, but will be relegated to an action for damages.

ID.—INCEPTION OF NEW SUPPLY BY WATER COMPANY—ESTOPPEL OF PLAINTIFFS TO ENJOIN PUBLIC USE.—Notwithstanding it may be assumed that the Riverside Water Company in sinking wells in the artesian belt is in the same position as if the boring thereof had been the inception of its operations; yet, where the plaintiffs stood by, knowing that the development was made for public use, and suffered the water company to proceed at large expense to successful operation, knowing or having reasonable cause to believe that it would affect their own source of supply, without any objection or protest on their part, prior to their suit for an injunction, they are estopped from maintaining a suit to enjoin the public use, and the injunction applied for must be refused on that ground.

ID.—PERCOLATING WATER—OWNER OF SOIL NOT ABSOLUTE OWNER—CORRELATIVE RIGHTS.—The doctrine that the owner of the soil is the absolute owner of the waters percolating therein and could extract the same at will, regardless of its effect on other lands, is not consistent to our conditions. The doctrine of correlative rights has been established by this court for the protection of present and future uses of such water against the unreasonable and remediless invasions that would be allowable under the doctrine of absolute and irresponsible ownership.

ID.—CASE AFFIRMED—APPLICABILITY—INJUNCTION.—While this court adheres to and approves the doctrine announced in *Katz* v. *Walkinshaw,* 141 Cal. 136, especially in respect to uses of percolating waters having their beginning after that decision was made, yet a clear case must be made to justify an injunction to prevent a continuance of the beneficial use of such waters, begun in good faith before that decision, and which was in full operation at that time.

ID.—WATER SUPPLY ORIGINALLY TAKEN FROM ARTESIAN WELLS—
CHANGE OF PLACE OF DIVERSION.—When the water supply of the
defendant Riverside Highland Water Company, was originally ob-
tained solely by means of artesian wells, and was supplied for dis-
tribution to customers for irrigation, and by this means large and
valuable improvements had been made in the territory to which it
was conducted, and it had gained the undisputed right to take the
water by this means to that place, it had the right to change its
place of diversion without injury to others, and to sink new wells
to take from the same source the same amount of water to its cus-
tomers without increase.

ID.—WATER SUPPLY OF STOCK COMPANY—CHANGE OF MODE OF DIVER-
SION.—Though the defendant Riverside 350-Inch Water Company
is not a public-service corporation, delivering water for public use,
but is organized as a stock company to deliver water for irrigation
to its stockholders in proportion to their respective amounts of
stock, yet when it has the unquestioned right to the amount of
water for use of its stockholders, it may change its original method
of diversion by means of open cuts to underground wells at the
same place, by means of which it takes only the same supply of
water from the same source.

APPEAL from a judgment of the Superior Court of San
Bernardino County.  Paul W. Bennett, Judge presiding.

The facts are stated in the opinion of the court.

Byron Waters, and C. C. Haskell, for Appellants.

Houghton & Houghton, Edward J. McCutchen, and Page,
McCutchen & Knight, for Riverside Water Company, Re-
spondent.

Henry Goodcell, and Charles R. Gray, for Riverside High-
land Water Company, Respondent.

Collier & Carnahan, for West Riverside 350-Inch Water
Company, Respondent.

SHAW, J.—This is an appeal by the plaintiffs from a judg-
ment of nonsuit in favor of said defendants.

The action is to enjoin alleged diversions of water from an
artesian basin alleged to exist in the San Bernardino valley.
Each plaintiff is the owner of a tract of farming land situated

over the said basin, on which he has been accustomed to use the waters of the basin. Some of them obtain the water by means of pumps, or artesian wells, and others by diversions from natural streams forced to the surface from the subterranean strata within the basin by the pressure of the water from the higher lands surrounding it. The respective tracts of land owned by the several plaintiffs are not contiguous but are situated in different parts of the basin and several miles apart. The basin is extensive, embracing something over thirty square miles. It is of irregular outline and somewhat circular in shape. The city of San Bernardino is situated near the center of it. It is alleged that the defendants, without right or authority, by means of artesian wells naturally flowing and other wells operated by pumps, are diverting from the basin, and carrying to lands not situated therein or in the watershed contributing thereto, large quantities of water from the said basin to be used for irrigation and other purposes on said outside lands; that by reason of these diversions the waters of said basin are depleted, the level thereof lowered and the common supply of plaintiffs diminished and exhausted to such an extent that the plaintiffs lands are deprived of the use of the waters of the basin, to the great damage of the respective plaintiffs. By the term "basin" we do not mean to imply that its floor is level. The central part of it slopes slightly toward the outlet at the southwest corner. During some extraordinary floods the Santa Ana River flows on the surface through the basin and over its outlet.

The lands of several of the plaintiffs do not lie within the limits of the basin as the same is claimed to exist by the plaintiffs themselves. These lands are situated below the outlet of the basin in a sandy formation which it is claimed is saturated with water overflowing from the basin. As to these lands, the claim of the plaintiffs is that the depletion of the waters in the basin by the alleged unlawful diversions of the defendants, diminishes the overflow to such an extent that the plaintiffs owning these lands are unable to obtain from such overflow sufficient water to irrigate their lands as they have heretofore done.

The plaintiffs allege that the water is confined in the basin by a dike of impervious material which by some convulsion of

nature has been thrown across the southwest and lower corner of the basin, extending from bed rock upward to about forty feet below the surface of the ground. This vertical space of forty feet, it is claimed, is occupied by a deposit of sandy material, similar to that within the basin, through which the water passes underground over the dike into the lands below, except in unusual floods, during which there is a surface stream there flowing. This so-called outlet is one mile or more in width. The diversions of water complained of are, for the most part, made above this alleged dike and within the artesian basin proper, but some of them are made from the sandy formation below the alleged dike.

The complaint alleges, in effect, that the artesian basin and the land immediately surrounding it is composed of a mass of sand, gravel, and other porous material, and that the water therein forms a common supply for the plaintiffs, so connected, because of the character of the material in which it lies and its free movement therein, that a diversion of water from one part of the basin is, practically, a diversion from the whole and decreases the common supply of all of them, though not affecting them all to the same extent. It is upon this theory that they all unite in one action, claiming that the injury to be enjoined is a common injury to all. These allegations are denied and the answers plead misjoinder of causes of action and of plaintiffs and defendants respectively. It is earnestly insisted, particularly by the attorney for the Riverside Highlands Water Company in a very able and elaborate brief, that there is no common supply and that there is consequently a misjoinder. We think that there is some evidence in support of the allegations of the complaint on this point, and, at all events, we will assume for the purposes of this decision that these allegations are sufficiently established and will not discuss the question of misjoinder. We think that the motion for a nonsuit was properly granted upon other grounds.

1. The Riverside Water Company is engaged in the business of taking water from this basin and carrying it to Riverside for sale and distribution in that community for irrigation and other purposes. It is a public service corporation, and the water it obtains from this basin is devoted by it to the use of the community at Riverside. It has been in

charge of this public use for many years. The exact time does not appear, but the evidence shows that it began some time prior to 1887 and that it has continued ever since. Originally, the water was all taken from Warm Creek, a stream rising within the basin by reason of hydraulic pressure in the underlying strata. Under natural conditions, this stream carried from 3500 to 4000 miner's inches of water, all of which was taken by said company and appropriated to said public use. From 1893 to 1900 there was a series of very dry years, the average annual rainfall being only 11.19 inches. The average for the decade from 1883 to 1893 was 20.10 inches and the general average since records have been kept is 15.62. The three seasons of 1897-8, 1898-9, and 1899-1900 were excessively dry, giving an average of only 8.12 inches. This prolonged drought, combined with the effect of large additional diversions of the waters of the basin by other persons for whom none of the defendants were in any wise responsible, caused the natural flow of Warm Creek to decrease gradually to about one half its former quantity. This decrease made it necessary for the Riverside Water Company, in order to supply those dependent upon it, to find means of obtaining more water. For that purpose and soon after the decrease became apparent, it began putting down artesian wells in the basin, and it has ever since continued to do so as its needs required, not with the intent to increase its diversion from the basin, but to keep it up to the original quantity. The evidence shows that this new method of securing the water was in use at least as far back as the year 1895. In 1899 and 1900, owing to the excessive drought aforesaid and additional diversions by others, additional wells were bored by this company and it is these wells against which the chief complaint is made, as against this defendant. The wells are deep and the expense of boring them must have been considerable. There was an absolute necessity for more water to serve the public use. The fact that the wells were being bored and that the water obtained thereby was taken to Riverside to supply the previous use was notorious. The fact that these diversions would decrease the common supply of all the plaintiffs was obvious and must have been known to each of them. The complaint alleges that the diversions of all the defendants by means of wells had

been going on continuously for at least two years before the action was begun. The complaint was filed on June 4, 1904. It is not seriously claimed that any of the plaintiffs were ignorant of these facts. Most of them, as witnesses, testified to knowledge thereof, many of them declaring that the wells of this company, bored in the years 1899 and 1900, immediately affected their own wells. No objection or protest against the boring of these wells by the Riverside Water Company was ever made by any of the plaintiffs. The first hint of any claim that these diversions were made without right on the part of the respective defendants was manifested by the beginning of this action.

So far as this company is concerned, the case comes within the rule established in *Fresno etc. Co.* v. *Southern Pacific Co.,* 135 Cal. 207, [67 Pac. 773], and followed in *Southern C. R. Co.* v. *Slauson,* (Cal.) 68 Pac. 107, and *Crescent Canal Co.* v. *Montgomery,* 143 Cal. 252, [76 Pac. 1032]. This rule, briefly stated, is that where one whose property is taken for a public use has stood by without objection, knowing that it was so taken and applied, and has allowed the public use to be instituted and carried on at great expense, and has permitted the people benefited thereby to adapt themselves to the new conditions and avail themselves of the conveniences and advantages thereby afforded, he cannot thereafter maintain an action to enjoin the continuance of such public use or to recover possession of the property so taken, but will be relegated to an action for damages. The rule was mentioned in *Katz* v. *Walkinshaw,* 141 Cal. 136, [99 Am. St. Rep. 35, 74 Pac. 772], a case involving the waters of this basin, where the court, evidently referring to cases such as that here presented and avowedly intending to suggest a rule of decision in such cases, said: "Where the complainant has stood by while the development was made for public use, and has suffered it to proceed at large expense to successful operation, having reasonable cause to believe it would affect his own water supply, the injunction should be refused."

We may concede, for the purposes of this case only, that the more recent diversions of the company by means of new wells are not a continuance of its ancient right to divert the waters naturally flowing in Warm Creek and that the wells do not

constitute a mere change of the means and place of diversion of the water to which the said company's right had been established. We may assume that the company is in the same position, with respect to these wells, as it would be if the boring thereof had been the inception of its operations. So assuming, it still remains true that the plaintiffs knew of these diversions of water from the basin and either knew, or had good cause to believe, that the water was being taken from their own source of supply and that such taking tended to exhaust the supply, that it was carried away for use outside the basin in a community depending thereon and which, we may presume, had settled and established itself there in reliance upon the continuance of that supply, (*Crescent C. Co.* v. *Montgomery,* 143 Cal. 252, [76 Pac. 1032]), that great expense in the mean time had been incurred in maintaining the supply and the works necessary for its distribution, and that, so knowing, they stood by for at least nine years after the well-boring had begun, and, by their own admission, two years after it was completed, and uttered no word of complaint or protest. The injunction against this defendant was properly refused on this ground.

The decision in *Katz* v. *Walkinshaw* was rendered, and the previous cases on the subject of percolating waters thereby overruled, because of our conviction that the doctrine that the owner of the soil was the absolute owner of the waters percolating therein and could extract the same at will, regardless of the effect on other lands, is unsuited to our conditions and would constantly tend to produce injustice and render insecure the title to water supplies devoted to beneficial use. The doctrine of correlative rights in such waters, declared in that case, was adopted because it was deemed necessary for the protection of present and future uses of such waters against the unreasonable and remediless invasions that would be allowable under the doctrine of absolute and irresponsible ownership. It was perceived that the decision would be regarded as an innovation and that it might cause suits to be begun to prevent the continuance of uses of such waters previously made. While adhering to and fully approving the doctrine announced in *Katz* v. *Walkinshaw,* especially in respect to uses of percolating water having their beginning after that decision was made, we desire to say that a clear

case must be made to justify an injunction to prevent a continuance of the beneficial use of such waters, begun in good faith before that decision and which was in full operation at that time, which is the condition presented by the case at bar. This action was begun only a few months after that decision became final.

2. The wells of the Riverside Highland Water Company are of more recent construction, and perhaps, as to some of them, there may be no laches or estoppel against the plaintiffs. But the injunction against this company was properly refused on still another ground. It is established by the evidence that the said defendant had originally obtained the water solely by means of artesian wells, that for ten years or more before the action was begun it had been maintaining such wells in the northwestern part of the basin several miles distant from the new wells here complained of, and that from said wells defendant had obtained a flow of about four hundred inches of water which it had been continuously transporting to places of use outside the basin, distributing the same to its customers, and that by this means large and valuable improvements had been made in the territory to which this water had been conducted. It had gained the undisputed right to take the water by this means and to this place. From the causes heretofore mentioned its wells began to fail, and the new wells complained of were thereupon sunk in the same basin, solely for the purpose of obtaining enough water, in connection with its old wells, to keep up its former supply to its former customers. The new wells take from the same supply as the old ones and the total amount taken has not been and is not to be increased. They constitute a mere change of the place of diversion without injury to others. In the case of running streams the right to make such a change is well settled and it is clearly just. (*Ramelli* v. *Irish,* 96 Cal. 217, [31 Pac. 41]; *Davis* v. *Gale,* 32 Cal. 34, [91 Am. Dec. 554]; *Jacobs* v. *Lorenz,* 98 Cal. 340, [33 Pac. 119]; *Smith* v. *Corbit,* 116 Cal. 592, [48 Pac. 725].) The rule is the same with regard to underground streams. (*Vineland Irr. Dist.* v. *Azusa Irr. Co.,* 126 Cal. 495, [58 Pac. 1057].) We think the reasons of the rule apply with equal if not greater force to one having a right to take a definite quantity of water from a basin of permeable material saturated with water and not composing part of any stream,

conceding this basin to be of that character as plaintiffs claim, and that said defendant is accordingly acting within its established rights in maintaining these new wells.

3. The same observations apply to the West Riverside 350-Inch Water Company. This company is not, strictly speaking, a public service corporation delivering water to a public use. It is engaged in procuring three hundred and fifty inches of water for its stockholders and delivering it only to stockholders in proportion to their respective amounts of stock, for use on their respective tracts of land. (See *McFadden* v. *Board of Supervisors*, 74 Cal. 571, [16 Pac. 397]; *Hildreth* v. *Montecito Water Co.*, 139 Cal. 29, [72 Pac. 395].) It obtains the three hundred and fifty inches of water from the region immediately below the dike above mentioned, where, as plaintiffs claim, the overflow from the basin saturates the sandy soil composing what is really the bed or wash of the Santa Ana River. Originally this company obtained the water by means of open cuts in the wash, beginning at the surface and running up stream, on a less grade than the surface of the ground, reaching a depth of some ten or twelve feet at the upper ends, the waters in the soil being thereby collected and conducted into its canal. Because of the prolonged drought and diversions from the water supply, above mentioned, the water level lowered so that the cuts no longer collected the amount of three hundred and fifty inches required by its stockholders. Thereupon the company sunk wells in the wash and inserted therein pumps by means whereof it obtained the requisite quantity of water, obviously from the same source of supply. There is no pressure upon the water in these wells. During the dry season the pumping lowers the water level at the pumps about twenty-five feet below the natural level. How far the cones of depression extend in the sandy soil at such times does not appear, but during the rainy season the former level is restored. The land of the nearest plaintiff is over a mile away and not directly in the course of the wash. It is at least doubtful if the wells of this defendant affect the water in his land, but conceding that they do diminish his supply and that of some other of the plaintiffs, they cannot complain of the action of this defendant in simply adopting different means of collecting the water to which it had by means of long use acquired an undoubted right. The

evidence shows that it had been diverting the water from this wash continuously for a period of at least fifteen years before the beginning of the action and that its right to do so by means of its cuts and trenches was not disputed.  Its right to the water being thus established it had a clear right, upon the principles heretofore stated, to continue to divert the water by changing its method of obtaining it.

The judgment is affirmed.

Angellotti, J., Sloss, J., Henshaw, J., Melvin, J., and Lorigan, J., concurred.