[L. A. No. 5925. In Bank.—June 3, 1921.]

CITY OF SAN BERNARDINO (a Municipal Corporation), Plaintiff, Appellant and Respondent, v. CITY OF RIVERSIDE (a Municipal Corporation), et al., Defendants, Appellants and Respondents.

[1] WATERS AND WATER RIGHTS—ORIGINAL SOURCE TO WATERS—RIPARIAN RIGHTS.—The original rights to the waters of the streams in this state are those which by the common law were vested in the owners of the land abutting upon the stream under the doctrine of riparian rights, which rights are attached to the land as parcel thereof and are private property.

[2] ID.—APPROPRIATION—TITLE—TIME.—Appropriation under the Civil Code is but another form of prescription, and the original rights of the abutting owners are not divested thereby until the period of prescription has run in favor of the appropriator, since such appropriation does not confer title immediately, as if by grant from the state, except when it affects lands belonging to the state or the United States.

[3] ID.—UNDERGROUND WATERS—PROTECTION FROM ADVERSE DIVERSION.—When a stream runs over porous material saturated with water, and the underground waters support the stream, either by upward or lateral pressure, or feed it directly, persons having rights in the streams will be protected against a depletion thereof by adverse diversions of such underground waters, unless there be a point of distance from the stream at which a diversion will have so little effect on the stream that it will not be actionable, which is ordinarily a question for the determination of the trial court.

[4] ID.—PERCOLATING WATERS—ORIGINAL TITLE.—The original title to percolating water was in the owner of the land in which it is found, under the elementary rule that the title and ownership of land extends to the center of the earth and includes everything in the cone having the superficial boundaries of the land for the base and the center of the earth for its vertex. The transfer of the land by the government to the individual passed this title and gave the land owner the right to all the water therein.

1. Nature of riparian rights and lands to which they attach, notes, 9 Ann. Cas. 1235; Ann. Cas. 1913E, 709; Ann. Cas. 1915C, 1026.

4. Correlative rights in percolating water, notes, 19 L. R. A. 92; 64 L. R. A. 236; 17 L. R. A. (N. S.) 650; 23 L. R. A. (N. S.) 331; 25 L. R. A. (N. S.) 465; 37 L. R. A. (N. S.) 193; L. R. A. 1915A, 369; L. R. A. 1915D, 1080.

[5] ID.—RECIPROCAL RIGHTS OF LAND OWNERS.—The respective rights of owners of land in the waters percolating or lying beneath the surface are reciprocal and correlative as to each other.

[6] ID.—RIGHTS OF LAND OWNERS.—Each owner of land overlying the same general underground supply of water may take such water on his own land for any beneficial use thereon, so long as such taking works no unreasonable injury to other land overlying such waters, and if the natural supply is not sufficient for all such owners, each is entitled only to his reasonable proportion of the whole, and each may apply to the courts to restrain an injurious and unreasonable taking by another and to have the respective rights adjudicated and the use regulated so as to prevent unnecessary injury and restrict each to his reasonable share.

[7] ID.—TAKING OF WATER OUTSIDE WATERSHED—RIGHTS OF PARTIES. No one, not even the owner of overlying land, has the right to take water out of the watershed for any purpose, if such taking will deprive of water any lands within the basin, and while the owner of overlying land who does not use such water thereon and whose land is not injured by an exportation of the water to outside lands has no right to enjoin such exportation, he may nevertheless apply to the court for a judgment declaring his own right to be paramount, and that such exportation is subordinate to his own right and enjoining the taker from making an adverse claim to the water, or from taking it in such quantities or in such a manner as to destroy or endanger the source of the supply.

[8] ID.—DIVERSION OF SUBTERRANEAN WATERS—ACTION BETWEEN MUNICIPALITIES—JUDGMENT—DETERMINATION OF "SURPLUS."—In an action between a city situated in an artesian basin which overlies a part of the subterranean waters of the basin and another city situated outside of the basin to determine the claims and rights of the parties and to enjoin the diversion of the water for use upon outside lands, a judgment defining the word "surplus" as used therein to be that condition of the basin which exists when the average annual feed to the basin or water crop, that is, all water which rightfully and properly reaches and replenishes the basin, exceeds, for any year or period of years, the aggregate of all the artificial rightful drafts, together with all the natural drafts made on the basin during the same period, not only prescribes an impractical and unworkable plan, but also endangers the rights of the parties.

[9] ID.—QUANTITY OF WATER—RIGHT OF PLAINTIFF—UNCERTAINTY OF JUDGMENT.—In such action, a provision of the judgment declaring that the plaintiff is entitled to take perpetually from the basin for municipal uses quantities of water which, together with the quantity it obtains from another source, will be sufficient to supply each inhabitant an average of two hundred gallons daily, and also to irrigate crops and trees grown on privately owned land

within the city at the rate of one inch to every 4.5 acres in citrus fruits, one inch to every 2.66 acres in alfalfa and growing crops, one inch to every ten acres in grain and one inch to every six acres in deciduous fruits, is objectionable on the ground that it is uncertain in regard to the quantity of water to which the right is given, in the absence of data in the findings from which the number of acres of land therein grown in the specified crops from time to time may be ascertained.

[10] ID.—RIGHT OF MUNICIPALITY TO UNDERGROUND WATERS — APPROPRIATOR.—A city situated in an artesian basin which overlies a part of the subterranean waters of the basin has no right to such waters on the theory that the underlying waters of the basin are by law subject to public use for the common benefit of the overlying lands and of the inhabitants of the basin, and that the city is substituted to the individual rights of land owners for the benefit of all, since the water is private property and the rights of the city as a municipality are not to be measured either by the law regarding riparian rights or by the law concerning the rights of the land owner in water underlying his land.

[11] ID.—WATER IN LANDS OF CITY OF SAN BERNARDINO — PRIVATE PROPERTY.—Land within the city of San Bernardino is a part of a Mexican grant, and the water in the land is private property and will remain such until it is taken from the owners of the land and devoted to public use.

[12] ID.—APPROVAL OF BOND ISSUE—ACQUISITION OF OUTSIDE LANDS—RIGHTS OF CITY LAND OWNERS UNAFFECTED.—An approval by the electors of a municipality, which overlies a part of the subterranean waters of an artesian basin, of a bond issue to acquire lands outside of the city which also overlie a part of the basin for the purpose of taking the water therefrom for public use in the city, does not operate as a transfer to the city by each owner of land therein of the right to take the water for public use to which he is entitled as such owner.

[13] ID.—CONFLICT BETWEEN APPROPRIATORS OF WATER — PRIORITY OF RIGHTS.—When a conflict arises between two appropriators of water and their rights are otherwise equal, the prior appropriator will prevail so far as the conflict extends, and in an action to quiet his title the prior appropriator is entitled to have his prior right declared to be superior to that of subsequent appropriators.

[14] ID.—CHANGE OF PLACE OF USE—RIGHT OF APPROPRIATOR.—With regard to water rights by appropriation, the appropriator may change the place of use thereof or the character of the use, without affecting his right to take it, and other persons interested in the source from which it comes have no right to object to such changes, and such principle is applicable to the taking of underground waters.

[15] ID.—CHANGE OF PLACE OF DIVERSION.—With regard to water rights by appropriation, the appropriator may change the place from whence the water is taken out of the source, provided others are not injured by such change, and such principle is applicable to the taking of underground waters.

[16] ID.—OWNERSHIP OF WATERS — CONSTRUCTION OF CODE AMENDMENT.—The opening declaration of section 1410 of the Civil Code, as amended in 1911, that all water or the use of water within the state is the property of the people of the state, taken literally, would include all water in the state privately owned and that pertaining to lands of the United States, as well as that owned by the state, but the declaration was without effect as to any water other than that pertaining to or contained in the lands of the state, since the state cannot, in view of article I, section 14, of the constitution, take private property for public use in such a manner.

[17] ID.—SUBTERRANEAN WATERS — DIVERSION OUTSIDE OF WATERSHED —ACTION BETWEEN MUNICIPALITIES—NATURE OF JUDGMENT.—In an action between a city situated in an artesian basin which overlies a part of the subterranean waters of the basin and another city situated outside of the basin to determine the claims and rights of the parties and to enjoin the diversion of the water for use upon outside lands, the judgment should not undertake to provide for the future apportionment of the water or for the ascertainment of a surplus or deficiency, but should be confined to existing rights and priorities, since the parties stand in the character of appropriators and the rights are to be determined by the law relating to appropriations.

APPEALS from a judgment of the Superior Court of San Bernardino County. Frank G. Finlayson, Judge. Reversed.

The facts are stated in the opinion of the court.

Byron Waters, C. C. Haskell, Ralph E. Swing and W. J. Guthrie, City Attorney, for Plaintiff, Appellant and Respondent.

Henry Goodcell, W. G. Irving, Miguel Estudillo and Samuel C. Wiel for Defendants, Appellants and Respondents.

SHAW, J.—Both parties have appealed from the judgment.

The city of San Bernardino is situated in what is known as the San Bernardino artesian basin, and the lands com-

prising it overlie a part of the subterranean water of said basin. The dispute in the case arises from the fact that both parties are taking such subterranean waters, the plaintiff taking them for the use of its inhabitants for domestic and other purposes, and the defendants taking them to be transported to the city of Riverside and the vicinity thereof for irrigation and domestic use, said region being entirely outside of the said basin and of the watershed which supplies water thereto. The complaint asks that the claims and rights of each of the parties be determined and adjudicated and that the defendants be enjoined from diverting water from said basin for use upon lands not situated therein or in the watershed tributary thereto.

The answer sets up the several claims of the defendants to the water aforesaid and denies that plaintiff has any paramount rights thereto. The defendants also filed a cross-complaint asking that their rights to take water from said basin should be determined and adjusted.

The court made elaborate findings in the case, covering three hundred pages in the printed transcript. Judgment was thereupon rendered, declaring the respective rights of the several parties in the water of the said basin. It was stipulated between the parties that ''whatever judgment may legally be entered as based on the findings of fact may be entered regardless of whether the findings, or any of them, are or are not embraced in the pleadings as filed.'' The appeal is presented upon the judgment-roll alone, and, in view of the aforesaid stipulation, our consideration of the case may be limited to a review of the findings, conclusions of law and judgment. The facts hereinafter stated are set forth in the findings.

The San Bernardino artesian basin is a plain, sloping generally toward the southwest. It is about twenty-five miles long from northwest to southeast, and ten miles wide. It is bounded on the northwest, north, and east by high mountains, and on the west, south, and southeast by hills or higher lands. At the southwest, near the town of Colton, there is a gap in the hills and higher lands, through which the water falling on the watershed, of which the basin is the lower part, escapes, partly by streams on the surface and partly by seepage through the sands, gravels, and soil beneath. The gradient of the surface of the basin from the

foot of the mountains toward this outlet varies from twenty-five to fifty feet per mile. Near the center there are level spaces which, prior to any artificial drainage, were swamps or marshes. It is probable that the basin was originally a lake and that its present condition is the result of the gradual filling of the bed in the course of ages by detritus washed down from the adjacent mountains. The material of the basin is composed of boulders, gravel, sand, and soils of varying textures. As the lake-bed gradually filled, the torrents from the mountain canyons changed their courses from time to time, forming underground strata or waterways of coarser material in which water percolates more freely than elsewhere. The material also lies in strata of varying permeability. In the adjacent mountains there are several canyons, in each of which a small stream generally flows in the dry season, and from each of which a large stream flows when there is a heavy rain upon its watershed. Of these the largest are Santa Ana River at the easterly end and Lytle Creek at the northwest. At the mouth of each canyon where it emerges from the mountains there is the usual debris cone of the coarser materials, such as boulders and gravel. In these cones a large portion of the water of the respective streams sinks and disappears. The Santa Ana River and Lytle Creek are the only streams that continue flowing on the surface as far as the outlet, and not infrequently in the dry season they also disappear before reaching it. The porous material filling the bed of the ancient lake is at least one thousand feet in depth in some places. The outlet, it is believed, was originally a narrow gorge, which has become filled to the surface with material sufficiently impervious to water to serve as a dam and prevent the escape of water below the surface to any great extent. The whole mass of underlying strata composing this basin is saturated with water. The upper stratum is soil of a closer texture than the strata beneath. This overlying cap confines the water to the porous strata below, and the gradient of these formations causes a hydrostatic pressure therein. This pressure forces to the surface a large part of the water, beginning near Harlem Springs, six miles from the outlet, and forms a stream known as Warm Creek. This stream gradually increases in volume in its course toward the outlet, at which point, before any artificial

depletion of the waters of the basin, there was ordinarily a flow amounting to three thousand five hundred inches of water. A smaller creek of similar origin, called Town Creek, is tributary to Warm Creek. Both pass through the city of San Bernardino. As early as 1869 a well was sunk in the basin, in which the water rose to the surface and flowed out as a stream. From that time until the present it has been a common custom for persons owning land over this basin and desiring water to obtain the same by means of such artesian wells. There are now between two thousand and three thousand of them, and by means thereof large quantities of water are taken from the underground supply. Owing to the large number of these wells the pressure in the strata has decreased so that many of them do not flow over the surface, and pumps are used to raise the water.

Before proceeding to the specific questions presented we deem it advisable to state some general principles of law on the subject of the waters of streams and artesian basins, which must be kept in mind in the consideration of the case.

[1] 1. The original rights to the waters of the streams in this state are those which by the common law were vested in the owners of the land abutting upon the stream, under the doctrine of riparian rights, as it is commonly termed. (*Lux* v. *Haggin*, 69 Cal. 255, [4 Pac. 919, 10 Pac. 674]; *Hudson* v. *Dailey*, 156 Cal. 628, [105 Pac. 748]; *Palmer* v. *Railroad Commission*, 167 Cal. 165, [138 Pac. 997].) Such rights are attached to the land as parcel thereof, and, of course, are private property. It is not necessary here to state the doctrine more fully, since there are no serious differences between the parties concerning it. We do not speak in this case of the public rights of navigation and fishery in navigable waters.

[2] It follows in consequence of this fact that all other present existing rights in the waters of streams have been acquired in some manner from the owners of such abutting lands, either by prescription, by contract, or by condemnation. Appropriation under the Civil Code is but another form of prescription, and the original rights of the abutting land owners are not divested thereby until the period of prescription has run in favor of the appropriator. This is a matter of some importance, for the effect of the code provisions has been greatly misunderstood, especially by the gen-

eral public and in public discussion. It is often erroneously assumed that such "appropriation" confers title immediately, as if by grant from the state. This is not true, except when it affects lands belonging to the state or the United States. (*Palmer* v. *Railroad Commission,* 167 Cal. 163, 172, [138 Pac. 997].)

[3] When a stream runs over porous material saturated with water, and the underground waters support the stream, either by upward or lateral pressure, or feed it directly, persons having rights in the stream will be protected against a depletion thereof by adverse diversions of such underground waters, if they are injured thereby. There may be a point of distance from the stream at which a diversion of such underground water will have so little effect on the stream that it will not be actionable. It is ordinarily a question for the trial court to determine whether or not this is true in the particular case before it. These matters are considered as applied to differing conditions in *Los Angeles* v. *Pomeroy,* 124 Cal. 617, [57 Pac. 585], *Miller* v. *Bay Cities W. Co.,* 157 Cal. 256, [107 Pac. 115], *Hudson* v. *Dailey,* 156 Cal. 626, [105 Pac. 748]; *McClintock* v. *Hudson,* 141 Cal. 279, [74 Pac. 849], and other cases, and will be adverted to herein in connection with the rights of Riverside Water Company.

The law of so-called "percolating" waters presents the principal questions in issue in this case. These waters are almost invariably found in permeable material of more or less density, such as sand, gravel, and boulders intermixed, in which the water will move readily by the force of gravity. [4] The original title to such water was in the owner of the land in which it is found, under the elementary rule that the title and ownership of land extends to the center of the earth and includes everything within the cone having the superficial boundaries of the land for the base and the center of the earth for its vertex. The transfer of the land by the government to the individual passed this title and gave the land owner the right to all the water therein. Originally in this state it was assumed that this title was absolute, and that each land owner could take out as much of such underground water as he pleased, regardless of the effect thereof on other lands, provided he took it on his own land and without a malicious intent to

injure others. But the immediate effect of such taking of water out of such land usually is to draw out the water from the surrounding land into the void or depression caused in the water plane in the land from which it is taken, and this, if continued, lowers the subsurface water plane in the vicinity thereof and eventually to a greater or less extent throughout the basin in which the lands are situated. If there is artesian pressure therein, this will reduce the pressure. In this manner the owner of one tract of land in such basin could take such water from another tract without an actual trespass thereon, and thus an injury could be done which the owner of the other tract could not prevent by any lawful physical means, and a resort to the courts was necessary. [5] In cases presenting these facts the original assumption of absolute ownership in such water was held untenable under the conditions existing in this state and the doctrine that the respective rights of owners of land in the waters percolating or lying beneath the surface are reciprocal and correlative as to each other was adopted. (*Katz* v. *Walkinshaw,* 141 Cal. 116, [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766]; *Newport* v. *Temescal W. Co.,* 149 Cal. 535, [6 L. R. A. (N. S.) 1098, 87 Pac. 372]; *Burr* v. *Maclay etc. Water Co.,* 154 Cal. 428, [98 Pac. 260], and other cases.)

[6] With regard to such land owners these cases hold that each owner of land overlying the same general underground supply of water may take such water on his own land for any beneficial use thereon, so long as such taking works no unreasonable injury to other land overlying such waters; that if the natural supply is not sufficient for all such owners, each is entitled only to his reasonable proportion of the whole, and that each may apply to the courts to restrain an injurious and unreasonable taking by another and to have the respective rights adjudicated and the use regulated so as to prevent unnecessary injury and restrict each to his reasonable share.

[7] With respect to other parties who take for use on lands outside the watershed of the basin, it is now established by said decisions that no one, not even the owner of overlying land, has the right to take water out of the watershed for any purpose, if such taking will deprive of water any lands within the basin; that while the owner of over-

lying land who does not use such water thereon and whose land is not injured by an exportation of the water to outside lands has no right to enjoin such exportation, he may nevertheless apply to the court for a judgment declaring his own right to be paramount, and that such exportation is subordinate to his own right, and enjoining the taker from making an adverse claim to the water, or from taking it in such quantities or in such a manner as to destroy or endanger the source of supply. (*Burr* v. *Maclay etc. Water Co.*, 154 Cal. 428, 436, [98 Pac. 260].) With respect to such cases, "the court unquestionably has power to make reasonable regulations for the use of such water by the respective parties, fixing the times when each may take it and the quantity to be taken, provided they be adequate to protect the person having the paramount right in the substantial enjoyment of that right and to prevent its ultimate destruction." (*Idem.*)

2. The court finds, and the judgment declares (clause 7) that the city of San Bernardino has the right to take and use in its public water service one hundred inches of water from the natural surface flow of Lytle Creek; that it also has the right (clause 6) to take from the subterranean waters such quantity of water as may be necessary for useful purposes beneficial to the several parcels of land which it owns overlying the basin, including Lugo Park and Meadowbrook Park, subject to future regulation as to the quantity to be taken; that Meadowbrook Park is riparian to Warm Creek, and that the city of San Bernardino, as owner thereof, is entitled to use thereon so much of the water of said creek as may be reasonably required, subject to future regulation as to quantity (clause 14).

Also (clause 10) that the defendant Riverside Water Company, subject to prior rights of others to take water from Warm Creek above its own intake, is entitled to take perpetually the entire natural flow of the creek at its point of intake, except as such flow may be diminished by water rightfully taken from the basin by the wells of the other parties to the action; that when said natural flow into its canal, at the intake thereof, during the months from April to October, inclusive, falls below an average aggregate of 2,710 inches, said company, while taking the whole flow of the creek, may also take from said basin into said canal, by

means of wells, enough additional water to maintain an
average aggregate flow of 2,710 inches therein, but, in effect,
that all of the water so taken by wells must be used, so
far as necessary, for irrigation and domestic use on certain
10,387.35 acres of land outside the basin, but not exceeding
for use in irrigation, at any time, the quantity required
to irrigate the crops and trees growing on said lands, ac-
cording to a certain schedule of quantities allowed per acre
for various kinds of crops and trees stated in the findings
and judgment. It is entitled to take for these purposes
all the natural flow of the creek when it exceeds 2,710
inches. It is also entitled (clause 15) to the reasonable use
of the waters of Warm Creek on certain lands riparian
thereto which it owns, subject to future regulation by the
court.

The court finds and adjudges (clause 11) that the city of
Riverside is entitled to take from the basin for municipal
uses and for its inhabitants an annual average flow of 282
inches.

It is declared that the word "inch," when referring to
water, is used in the findings and judgment to designate
a continuous flow equal to "one-fiftieth of a cubic foot of
water per second of time." For the sake of brevity we
use the word with the same meaning in this opinion.

3. In so far as the above-stated provisions of the judg-
ment purport to declare the present rights of the three
parties to the action to take and use the waters in question
away from the lands in which they lie, they do not ap-
pear to be injurious to any of them under the conditions
found and adjudged to be now existing. Each party, as will
be hereinafter more fully shown, is claiming such water
solely as an appropriator of water necessary to supply a
public use of which it is the administrator. The court finds
and the judgment declares that up to the time of the trial
there was at all times more water coming into the artesian
basin, and included in the surface streams and underground
waters thereof, than was required to supply all the needs
of all the parties and all the rightful diversions of all other
parties therefrom. While this condition continues there can
be no unreasonable injury to anyone from the continued
taking in quantities no greater than has been taken hereto-
fore. In dry years they might be compelled by necessity

to bore more wells or to put in more pumps or substitute more powerful ones, in order to obtain the supply now in use, but this must be considered no more than a reasonable requirement, at least under the conditions existing in that part of the state, so long as this process does not result in using quantities of water exceeding the quantity that would be restored to the basin, in excess of the use, during succeeding wet years.

For these reasons we do not deem it necessary to discuss extensively the objections of any of the parties to the judgment so far as it operates only on the aforesaid existing rights and relates to existing conditions. In other parts of the judgment the court below undertook to provide for future conditions and contingencies, to authorize further and additional takings of water from the basin in the future as the needs of future conditions might require and to establish a mode for the regulation and administration of the waters of the basin by the court by proceedings in this action after judgment. In our opinion these parts of the judgment are so far erroneous that the entire judgment must be reversed and the cause remanded for further proceedings. As will hereinafter be shown, the requirement that the Riverside Water Company must deliver the water it takes from the basin by wells exclusively to the 10,387.35 acres of land to which it has been heretofore delivered is also erroneous. We proceed to the considerations of the provisions last mentioned.

4. The defendants earnestly object to the provisions of the judgment regarding the existence of a "surplus" or "deficiency" as therein defined. Clause 16 thereof defines the words thus:

"The word 'surplus' used in this judgment, means, and for all purposes of this judgment shall be deemed to mean, that condition of the San Bernardino artesian basin which exists when the average annual feed to the basin or water crop, that is, all water which rightfully and properly reaches and replenishes the basin, exceeds, for any year or period of years, the aggregate of all the artificial rightful drafts, together with all the natural drafts, made on said basin during the same period; and a 'deficiency,' as that word is used in this judgment, exists during such times as there is not a surplus, as herein defined."

It is further adjudged (clause 13) that there now exists in said basin a "surplus" of water, as thus defined; and (clause 12) that while any such surplus exists and so long as it continues, each of the parties may take for any beneficial purpose from said basin by wells "such quantities of water, even though in excess of the quantities hereinbefore specified, as such parties may deem reasonably necessary or proper, but not for waste," except that the Riverside Water Company must not take water therefrom by wells when it is not taking all of the natural flow of Warm Creek. This provision is declared to be effective, "anything hereinbefore to the contrary notwithstanding."

It seems clear that if the surplus exists, as both findings and judgment declare, and while it exists, the taking of additional water by either party can cause no substantial injury to either of the other parties, so far as their respective rights as owners of overlying lands, or as owners of the adjudged rights to take by means of wells the stated quantities aforesaid, are concerned, provided such additional taking is not allowed by continued use to ripen into a right superior or equal to the rights so adjudged, or to their rights as owners of overlying lands. The judgment contains other provisions which we think must be so construed as to prevent either party from claiming that a continued taking of such additional water shall give any right superior or equal to the rights as owners of overlying land, or to the present rights to take by means of wells. The judgment reserves in the court jurisdiction to determine, at any time, and from time to time, of its own motion, or on motion of either party, whether there is or is not a surplus, and thereupon to make such order or judgment as may be appropriate as to the quantity of water to be taken from the basin, or as to the use to which it may be applied, by any party or parties to the action, during such times as there shall not be a surplus in the basin. Neither party could, by such additional taking or use, obtain any right that would avail against this reserved power of the court, or that could be set up in opposition to any order the court should make in the proper exercise of that power. It should, however, have made an express declaration to that effect, instead of providing it by implication arising from the reservation of power. The case, in this respect, falls within

the doctrine stated in *Burr* v. *Maclay Rancho Water Co.*, 154 Cal. 428, [98 Pac. 260], as aforesaid.

The rights of the Riverside Water Company to the natural flow of Warm Creek are not fully protected by these provisions. The findings show that it has rights relating to the waters of said creek of two sorts, both of which are perhaps prior and paramount to the rights of the other parties hereto to take water from said basin for public use. The first is the right to take the entire natural flow of the creek. The second arises from the depletion of the natural flow by the taking of water from the basin by the other parties hereto and others, subsequent to the inception of its own right in the stream, and is the right to take, by means of wells bored in the basin, enough water to augment the depleted natural flow, so as to produce in its canal a total flow of 2,710 inches during specified months. These rights should be declared to be paramount to the rights of the other parties hereto, if the findings justify that conclusion. The judgment erroneously assumes, apparently as matter of law, that the respective rights of the parties to take water for public use are coequal. (See on this point, *post*, subd. 7.) While the surplus continues, the condition of the respective parties as to their right to take water from the basin for public use is substantially the same as that of several appropriators from a surface stream having more than enough water for all. No injunction should issue against the taking of water while the supply is ample for all. But the respective priorities of each water right should be adjudged, so that if in the future the supply falls below the quantity necessary for all, he who has the prior right may have his preferred right protected.

[8] We are of the opinion that the aforesaid definition of the word "surplus" prescribes an impractical and unworkable plan for the determination of the question whether there is or is not a surplus. The court must first ascertain "the average annual feed" to the basin from water "rightfully and properly" reaching it and "replenishing" it, for any year or period of years. This obviously refers to the "average annual" rainfall on the watershed and to the part thereof which reaches and replenishes the basin. The findings show the difficulties attending this inquiry. The annual rainfall has varied from 37.51 inches in 1883–84 to 7.49 inches in 1898–99. The average annual rainfall at San Bernardino

from July 1, 1871, to July 1, 1916, was 16.2 inches per year. From 1893–94, to 1899–00 the yearly average was only 11.09 inches. The water which sinks into the debris cones and percolates underground toward the outlet moves at the rate of only two miles in a year, and it is several years before it reaches the points where Warm Creek rises and where the wells of the parties are located. Hence neither the rain of a wet year nor the decrease in a dry year becomes manifest in the water level at Warm Creek and at the wells in question for several years afterward. There are no practical means of ascertaining the total annual rainfall on the watershed. No records are kept except in San Bernardino and a few other places. We may judicially take knowledge that the amount varies greatly in different parts of the watershed; that in the high mountains it will usually greatly exceed the fall in the basin; that cloudbursts may occur in one of the canyons when there is a mere sprinkle in other parts of the range, and that even in a general storm the rain may be heavy at one place and light in others without any cause except the course of the winds, the conformation of the mountains and the like, and that a slight change in the direction of the wind will materially affect the rainfall in the different places affected. During the period from 1881 to 1916, the average rainfall at San Bernardino was 16.41 inches and that at Riverside 11.02 inches. The two cities are about twenty miles apart, on the same general plateau and with about one hundred feet difference in elevation. To ascertain with even approximate accuracy the rainfall on the entire watershed for any year a large number of additional daily records must be kept and great expense must be incurred therefor.

The actual increase to the waters of the basin in any one year cannot be measured by the rainfall for that year. During a heavy general rain a large proportion of the precipitation flows down from the canyons in the channels of the surface streams and through the outlet of the basin without ever sinking below the surface. It is impossible to measure these flood waters. Such a flood may constitute the major portion of the seasonal rainfall. In another season the rains may come more regularly and evenly, but in the same quantity, so that a very large portion of it sinks into the basin and none runs off. In the drier seasons the rain may practi-

cally all evaporate and none of the waters thereof reach the basin. The amount of such evaporation cannot be measured. It will vary from time to time, according to the humidity or aridity of the atmosphere and the amount of sunshine.

From these facts, all of which appear in the findings, it is apparent that the first factor in the computation of the surplus, the amount of water rightfully and properly reaching the basin, cannot be ascertained.

The other factor, the "artificial rightful drafts" upon the basin, could not in any event be computed or ascertained without extraordinary expense. The average amounts taken by the three parties to this action are ascertained and stated in the findings. But these comprise much less than half of the drafts that may be "rightful." Other companies and persons take and carry away to outside lands about six thousand inches. In addition to this exportation, between two thousand and three thousand wells are operated by owners of land in the basin to obtain water for use upon their respective tracts of land. None of these exporters and users is a party to this action. The amount thus taken for overlying lands would naturally vary greatly from day to day and from time to time. There is no means of compelling the persons concerned to keep accounts of the quantities taken. The parties to this action have no right to enter the premises of such users to measure the water taken. The ascertainment of the amounts taken in any one year, or at all, is, therefore, practically impossible for either party.

If such deficiency were actually ascertained and an order were made apportioning to each party its proper reduction on account thereof it would not prevent the exhaustion of the water in the basin. The order would bind no one except the three parties to this action. Other persons are taking from the basin, presumably by right, a much larger quantity of water than is taken by the parties. The order would have no effect upon any of them. If their needs were greater, as would be probable in a dry year, they would naturally take more than before, and it is certain they would take no less. Thus the exploitation of the water of the basin would proceed and its exhaustion would ensue, from the excessive use by other persons, while the respective parties would be restrained by this order. If such exploitation continued for five years uninterruptedly under claim of right, with the

knowledge of the parties hereto and to their injury, such
adverse use would ripen into a right to do so perpetually as
against these parties. (Civ. Code, sec. 1007; *Katz* v. *Wal-
kinshaw,* 141 Cal. 116, 135, [99 Am. St. Rep. 35, 64 L. R. A.
236, 70 Pac. 663, 74 Pac. 766]; *Burr* v. *Maclay etc. Co.,*
154 Cal. 436, [98 Pac. 260]; *Barton* v. *Riverside W. Co.,* 155
Cal. 518, [23 L. R. A. (N. S.) 331, 101 Pac. 790].)   Thus
it appears not only that such an order would be practically
ineffective, but also that it would endanger the rights of all
the parties.

. 5. In addition to the above-stated rights adjudged in favor
of San Bernardino, the judgment declares (clause 8) that
said city is entitled to take perpetually from the basin by
means of wells, for municipal uses and for the use of its
inhabitants, quantities of water which, together with the
quantity it obtains from Lytle Creek, will be sufficient to
supply to each inhabitant an average of two hundred gallons
daily, and also to irrigate crops and trees grown on pri-
vately owned lands within the city at the rate of one inch
to every 4.5 acres in citrus fruits; one inch to every 2.66
acres in alfalfa and garden crops; one inch to every ten
acres in grain, and one inch to every six acres in deciduous
fruits, all to be measured at the point of delivery on the land.

[9]   This provision is objectionable on the ground that it
is uncertain in regard to the quantity of water to which the
right is given thereby; that it "fails to attain the certainty
necessary to an estoppel" upon a part of "the subject of the
litigation." (*Riverside W. Co.* v. *Sargent,* 112 Cal. 233, [44
Pac. 560].)   In that case the judgment of the lower court
was that the defendant had the right to take water by a cer-
tain dam and ditch "to the extent of the full capacity of
said ditch." This, it was said, was too uncertain because of
the fact that the carrying capacity of the ditch, its size and
grade, was not shown by the record. In the present case the
findings show the present population of San Bernardino, but
there are no data from which to ascertain the number of
acres of land therein grown in the specified crops from time
to time. The population is expected to increase and the area
of such land will fluctuate materially from year to year.
The object of the provision evidently was to provide for
more water in the future, as the need increased. It is im-
possible, for these reasons, to ascertain from anything in the

findings or judgment the extent of such increase, and hence the amount of water the plaintiff may be entitled to under this clause cannot be determined.

There is no finding expressly to the effect that said city has ever acquired the right, as against the defendants, to take additional quantities of water from the artesian basin by means of wells, except such as it may have by reason of its being the owner of lands overlying the basin for use on such land, which, of course, does not include the right to take it for public use. The findings and judgment suggest that the theory of the court below was that the fact that the city itself was situated within the basin gave it the right to take water therefrom for any public use which as a municipality it has the power to administer. As this proposition is also involved in the consideration of the further right given by clause 9 of the judgment treated in the next following subdivision of this opinion, we will not further discuss it here.

6. The next objection of the defendants is to clause 9 of the judgment, declaring that the city of San Bernardino is entitled to take, perpetually, from the basin, if required for any reasonable beneficial use, as much water as said city, as an owner of land in the city overlying the basin, and all private owners of such land within the city, as such owners of overlying land, shall be entitled, in the aggregate, to take from the basin, such taking by the city, however, to be subject to the supervision of the court both as to the quantity taken and as to the uses to which it is to be applied.

[10] In support of this clause, and also of clause 13 aforesaid allowing water to be taken when a surplus exists without limit as to quantity, the plaintiff advances the theory that the underlying waters of this basin are by law subject to public use for the common benefit of the overlying lands and of the inhabitants of the basin, or have become so by the acts of the parties interested therein, that the part of the waters pertaining to the lands within the city is set apart by law for the common public use of the owners of the land and other persons in the city, that the city has in some manner become the administrator of this public or common use in place of the land owners and has become substituted to their individual rights for the benefit of all, and that in that character it may at any time take from any part of the basin, whether the place of taking be inside or outside of the city,

so much of the waters thereof as may then be necessary for such public use, not exceeding the aggregate quantity originally pertaining to the lands within the city. The court below, it is claimed, held to some theory of this nature and framed these provisions in accordance therewith.

This theory is refuted by what we have already said. The ownership of the land, at common law, included all that lay within and under it. A grant of land by public authority to an individual without reservation carried with it title to all water lying therein and vested in the grantee the absolute title to the water therein, as much so as to the earth and rocks and the trees growing thereon, subject only to the correlative rights of other land owners in such waters, under the maxim of the Civil Code that "one must so use his own rights as not to infringe upon the rights of another." (Sec. 3514.) The water was part of the land and it was no more public property, or subject to public or common use, than was the land. This was true even under the Mexican law. (*Lux* v. *Haggin*, 69 Cal. 331, [4 Pac. 919, 10 Pac. 674].) [11] We mention this because the land within the city of San Bernardino is a part of a Mexican grant. The water in all these lands, therefore, is private property, and will remain private property until it is taken from the owners of the land and devoted to public use. It does not appear that this has ever been done, except in so far as the taking of waters of the basin by the plaintiff and defendants, respectively, by means of wells bored in land outside of the city has drawn from the waters underlying lands within the city. This may have happened, but none of the owners of the land, so far as appears, has ever conveyed or transferred to any of the parties the right to take such water in that or any other manner. So far as such right has been acquired from them by prescription, it extends only to the quantity heretofore taken, and does not include the taking of an additional quantity in the future, and the dedication to public use of that which has been taken has not been made by such land owners, but by the party who has taken the water from them.

Neither the city of San Bernardino, nor either of the defendants, aside from their respective rights acquired by prescription and by the estoppel against interference with an established public use under the doctrine stated in *Barton* v. *Riverside W. Co.*, 155 Cal. 515, [23 L. R. A. (N. S.) 331,

101 Pac. 790], and *Miller & Lux* v. *Enterprise etc. Co.*, 169
Cal. 425, [147 Pac. 567], has ever taken any steps to acquire
rights to take water from the basin except by acquiring
tracts of land therein and boring wells in such land. The
purchase of the land conferred no water right upon the
buyer except the right to take water for use on the land it-
self. The lands acquired by San Bernardino for this pur-
pose, and the only land in which it has bored wells for such
water, all lie outside the city. Consequently the acquisition
of the land conferred no title to the rights of the owners of
overlying lands within the city to take water for use on their
respective tracts of land therein. [12] It is suggested that
the fact that the city issued bonds to raise money with which
to buy these outside lands and install its works to take water
therefrom for public use in the city, and that the electors of
the city approved the bond issue by a two-thirds vote at an
election held for that purpose, operated as a transfer to the
city by each owner of land within the city of the right to
take the water for public use which he was entitled, as such
land owner, to take from the basin, and as an agreement
that it might be taken from the basin by means of wells on
any land outside the city. We can see no connection what-
ever between the act of voting and the result claimed for it.
No land owner could vote away another's right. There is
nothing to show how many, if any, or who, of the land
owners voted. The proceedings for the election presented
no such question to the voters for decision. It is evident
that the proceedings and vote are utterly without signifi-
cance.

Our conclusion is that the several water rights in the basin
pertaining to the lands in the city as overlying lands are not
by law, and have not become in fact, subject to public use
by the city, or a part of the water rights which it owns.

7. Plaintiff contends that the rights of each of the parties
to take water from the basin by wells are equal. This con-
tention is based on the fact found by the court that there
always has been, and still is, sufficient water in the basin to
supply the parties and all others who take said waters with
all the water they have heretofore taken. From this it is
argued that neither party has injured any of the others by
the diversion and use of such waters, that there has been no
invasion by either of any right to the use of the waters by

the others, and hence that the respective uses have not been adverse as to each other, and the statute of limitations did not begin to run so as to start the period of prescription. As authority for this proposition they quote from *Anaheim etc. Co.* v. *Semi-Tropic etc. Co.*, 64 Cal. 192, [30 Pac. 626], the following passage: "It is very clear that while there was sufficient water flowing in the river to supply the wants and demands of all the parties, its use by one could not be an invasion of any right of any other; and as the court below found, as a fact, that until within a year or two prior to the commencement of the action there was sufficient water flowing in the river to supply the wants and demands of all the parties, it is plain that the plaintiffs as against the owners of the Santiago Rancho have acquired no right by prescription." They also cite to the same point *Alta etc. Co.* v. *Hancock*, 85 Cal. 219, [20 Am. St. Rep. 217, 24 Pac. 645], and *Faulkner* v. *Rondoni*, 104 Cal. 140, [37 Pac. 883]. In the Anaheim case both parties were exercising their rights to use the water of the river on riparian land. In such case the use by one is not adverse to the other unless he is using more than his share, to the detriment of the other. In the Alta Company case the remarks on the subject are *obiter*. The point decided was that one who trespasses on land of another and while so doing cultivates the land and irrigates it from a stream on which it abuts does not thereby acquire any right to the water apart from the land, so that when he is compelled to yield possession to the true owner, the prior use of the water by such trespasser does not give him a right thereto which he can convey to a third person. In *Faulkner* v. *Rondoni* the plaintiff had acquired his water right prior to any diversion of use of the water of the stream by the defendant. The defendant had, however, diverted and used the water continuously for a period of five years before the beginning of the action of plaintiff to quiet his title. There was enough water in the stream for both all the time, and the use by the defendant had not in any way interfered with the use by the plaintiff. The plaintiff's use was prior in time and, of course, it could not have been divested by a subsequent use which in no way affected his enjoyment thereof. The priority of the rights of either party in such cases could not become an important question until there was an interference by one of them with the use of the

other. When that occurs the principle stated in section 1414 of the Civil Code, that "as between appropriators, the one first in time is the first in right," becomes applicable. It is a principle which applies as well to ordinary prescriptive rights as to rights of appropriation under the code. (*Hill* v. *King*, 8 Cal. 338; *Butte Co.* v. *Vaughn*, 11 Cal. 153, 154, [70 Am. Dec. 769]; *Davis* v. *Gale*, 32 Cal. 33, [91 Am. Dec. 554].) **[13]** We understand the true rule to be that when a conflict arises between two appropriators of water, and their rights are otherwise equal, the prior appropriator will prevail so far as the conflict extends. It necessarily follows that in an action to quiet his title the prior appropriator is entitled to have his prior right declared to be superior to that of subsequent appropriators.

We do not hold that the findings show that the diversions of water by the respective parties have not interfered with the diversion and use of water by the other parties. On the contrary, the facts found indicate that the several diversions have interfered with each other. We do not take up this question, but leave the extent and effect of the interferences from the facts found, as well as the question of priorities, for the consideration of the trial court when the case is remanded for further proceedings.

8. As above indicated, the judgment appears to declare that the water to be taken by the Riverside Water Company from its wells bored in the basin cannot be used except for the irrigation of the particular lands to which it has been heretofore supplied, and must not exceed the quantity necessary to irrigate the same according to the above-mentioned schedule of quantities per acre for specified crops or trees thereon. It is at least susceptible of that construction. If so intended, it is to that extent contrary to law. **[14]** It has long been settled in this state with regard to water rights by appropriation that the appropriator may change the place of use thereof or the character of the use, without affecting his right to take it, and that other persons interested in the source from which it comes have no right to object to such changes. (*Maeris* v. *Bicknell*, 7 Cal. 263, [68 Am. Dec. 257]; *Davis* v. *Gale*, 32 Cal. 33, [91 Am. Dec. 554]; *Ramelli* v. *Irish*, 96 Cal. 217, [31 Pac. 41].) **[15]** It is also settled that such appropriator may change the place from whence the water is taken out of the source, provided others are not injured

by such change. (*Ramelli* v. *Irish, supra; Barton* v. *Riverside W. Co.*, 155 Cal. 517, [23 L. R. A. (N. S.) 331, 101 Pac. 790].) In *Barton* v. *Riverside* this doctrine was applied to the waters of this artesian basin. The reasons for the right to make the above changes are that by his taking and devoting water to a beneficial use, the appropriator has acquired the right to take the quantity which he beneficially uses, as against others having no superior rights in the source, and that neither the particular place of use, the character of the use, nor the place of taking is a necessary factor in such acquisition. The change of place of taking becomes wrongful only in the event that others are injured thereby. These reasons are as well applicable to the taking of underground waters of any kind as to diversions from a surface stream, and we perceive no reason why the same rule should not apply equally to both.

9. We think it sufficiently appears from what we have already said that with respect to the taking of water from the basin for the public uses which they respectively serve, the status of each of the parties hereto is that of an appropriator only. For that purpose neither party obtains any right to additional water by reason of its ownership of land within the basin, for the water rights arising from such ownership pertain exclusively to the land and are not devoted to public use by reason of such ownership. Whenever either party takes such water from the land and delivers it into its reservoirs, canals, or mains as a part of its water held for the public use, at that moment it becomes a mere appropriator of that water and its rights thereto are no greater, as against the other parties, than would be the case if the water was taken out of land which it did not own.

[16] As heretofore suggested, the court below was apparently of the opinion that the waters of this basin were by law subject to public use. Possibly in this connection it may have considered the legislative declaration on the subject in 1911 amending section 1410 of the Civil Code. The section, as amended, opens with this declaration: "All water or the use of water within the state of California is the property of the people of the state of California." Taken literally, this would include all water in the state privately owned and that pertaining to lands of the United States, as well as that owned by the state. It should not require discussion or au-

thority to demonstrate that the state cannot in this manner take private property for public use. (See *Palmer* v. *Railroad Commission,* 167 Cal. 175, [138 Pac. 997].) The constitution expressly forbids it. (Art. I, sec. 14.) The water that pertained to or was contained in the lands of the state was already the property of the people when this amendment was adopted. The statute was without effect on any other property.

10. We do not attempt to declare from the findings what the respective rights of the several parties are to the waters in the basin, nor what judgment should be given with regard thereto. The findings state the facts at great length and give many details which are evidentiary in effect and which might reasonably warrant the drawing of varying inferences therefrom. They are more comparable to a bill of exceptions summarizing the evidence, as such bills should, than to findings of ultimate facts. The determination of the material and controlling facts from such a mass of evidentiary facts is more properly the work of a trial court than of an appellate court. Furthermore, our conclusions upon the points we have treated are in so many particulars opposed to the apparent views of the learned judge who made the findings and rendered the judgment, that we are by no means certain that additional evidence may not be necessary for the intelligent decision of some of the questions involved in the case and presented by the facts found.

The briefs contain seventeen hundred printed pages, and they discuss many minor points which we have not noticed. We do not consider them essential to any of the points we have decided nor necessary for the guidance of the trial court in future proceedings. Our conclusions upon the more important questions may be summarized as follows:

[17]  *a.* With respect to the waters taken from the artesian basin for public use, each party stands in the character of an appropriator, and its rights therein are to be determined by the law relating to appropriators and are not to be measured either by the law regarding riparian rights or by the law concerning the rights of the land owner in water underlying his land.

*b.* In this action the court should not undertake to provide for the future apportionment of the waters of the artesian basin or for the ascertainment of a surplus or deficiency, but

should confine itself to the adjudication of the existing rights and priorities of the parties to the action in the waters involved. The judgment should state the quantity of water to which each party is entitled and should not leave such quantity indefinite or dependent on future needs, events, or conditions.

*c.* The judgment should not make any declaration of the right of any party to take in the future any water to which it has no present right.

*d.* The plaintiff is not substituted to nor entitled to use the water or water rights of the owners of land within its limits unless it has acquired such right directly or indirectly from such land owners, and then only for use on the particular land of such owner.

*e.* The measure of a water right acquired by taking and using the water extends only to the quantity actually theretofore applied to beneficial uses and includes no right to take additional water in the future.

The judgment is reversed and the cause remanded, with directions to the court below to make new conclusions of law and render a new judgment on the findings, in accordance with this opinion, and, if necessary to do so, to take additional evidence relating to, and make an additional finding upon, any point involved in the case, or, if the parties agree thereto, to try the entire case anew. Neither party shall recover its costs of appeal herein.

Olney, J., Lennon, J., Angellotti, C. J., Sloane, J., Wilbur, J., and Lawlor, J., concurred.

Rehearing denied.

All the Justices concurred.