[Civ. No. 6399.    Fourth Dist.    Jan. 26, 1961.]

ORANGE COUNTY WATER DISTRICT, Respondent, v. CITY OF RIVERSIDE et al., Appellants.

Leland J. Thompson, Jr., Leo A. Deegan and Albert H. Ford, City Attorneys (Riverside), Harry M. Dougherty, Deputy City Attorney, Cosgrove, Cramer, Diether & Rindge, Leonard A. Diether, Gordon Pearce, William A. Flory and Ralph H. Prince, City Attorneys (San Bernardino), Martin C. Casey and Lawrence A. Hutton, City Attorneys (Colton), Edward F. Taylor, City Attorney (Redlands), Douglas L. Edmonds, DeWitt A. Higgs and James L. King for Appellants.

Best, Best & Krieger, James H. Krieger, Arthur L. Littleworth, Surr & Hellyer and John B. Surr as Amici Curiae on behalf of Appellants.

Rutan, Lindsay, Dahl, Smedegaard, Howell & Tucker, A. W. Rutan, Milford W. Dahl, Roger Howell, Pillsbury, Madison & Sutro, Eugene M. Prince, Eugene D. Bennett, James Michael and Samuel L. Wright for Respondent.

HAINES, J. pro tem.*—For the second time this case is before us on appeal. The first appeal (*Orange County Water District* v. *City of Riverside*, 173 Cal.App.2d 137, et seq. [343 P.2d 450]) was determined on August 28, 1959; rehearing denied on September 18, 1959; and hearing denied by the Supreme Court on October 15, 1959. We therein reversed the judgment of the superior court and remanded the case to it with instructions to make new findings and enter a new judgment not inconsistent with the views which we expressed. After receiving the remittitur the trial court proceeded to make new findings, prepared at its request by counsel for the respondent District, overruling numerous objections to them, and, on the basis of its new findings, entered on December 16, 1959, an amended judgment. From this the city of Riverside has appealed, and from it also the cities of San Bernardino, Colton and Redlands jointly appeal.

---

*Assigned by Chairman of Judicial Council.

It will be convenient first to deal with the brief of counsel for the city of Riverside insofar as they undertake to raise again the basic questions determined on the former appeal.

We noted in our original opinion (*Orange County Water District* v. *City of Riverside,* 173 Cal.App.2d 137, 163-164 [343 P.2d 450]) that the complaint filed by the Orange County Water District (hereinafter referred to as the "District") sufficiently alleged that there are not less than 120,000 acres of land within the District possessing overlying rights in the subterranean water fed by the Santa Ana River. We further held (pp. 177, 183) that there was evidence before the trial court that as of 1955, the latest year for which statistics were available at the original trial, 90,115 acres of this land were in crop and had aggregate irrigation requirements of 126,617 acre-feet of water per year, of which there was evidence tending to show that 108,485.2 acre-feet were actually produced from what has been known in the record as the "District Basin" and during the year between July 1, 1954, and June 30, 1955, devoted exclusively to agricultural use on the overlying lands. We also pointed out that the difference between the 108,485.2 acre-feet so produced and the 126,617 needed (amounting to 18,131.8 acre-feet) was wholly accounted for by the circumstance that many of the overlying land-owners appear from the record, in lieu of pumping, to have resorted instead, for part of their water, to the two water companies that take their supplies from the river, for the most part from intakes below the Prado Dam, which is outside the District lands, but, with insignificant exceptions, apply the water so taken to lands within the District, and by that token, are included among those represented in this litigation by the District.

In these circumstances, as the first point made on their present appeal, counsel for the city of Riverside assert that: "The amended judgment herein is erroneous since it is based upon the 'needs' for water in the respondent district and not upon overlying water rights, if any, still retained by landowners therein for agricultural purposes."

But the essence of an overlying right, which is in that respect strictly analogous to a riparian right, is the right of its owner, with due regard to the correlative rights of others owning lands overlying the same body of water to use on his overlying lands such water as he needs for beneficial uses, or since the amendment of the state Constitution in 1928 (article

XIV, section 3), such water as he reasonably needs for such uses. In other words, since this 1928 amendment, the needs of such owner mean his reasonable needs and these are the measure of the right. (*Southern California Investment Co.* v. *Wilshire*, 144 Cal. 68, 71 [77 P. 767]; *Gin S. Chow* v. *City of Santa Barbara*, 217 Cal. 673, 695-706 [22 P.2d 5]; *Hudson* v. *Dailey*, 156 Cal. 617, 628 [105 P. 748]; *Burr* v. *Maclay Rancho Water Co.*, 160 Cal. 268, 273 [116 P. 715]; *City of San Bernardino* v. *City of Riverside*, 186 Cal. 7, 24 [198 P. 784].)

In the light of these decisions, the trial court's finding of 126,617 acre-feet per annum as the requirement of the acreage referred to for irrigation must be construed as meaning the reasonable need of that acreage and, by that token, if no other showing had been made, the measure of its water right. Such measure of its water right may practically be limited if it be shown that such right cannot be fully exercised with due regard to the correlative needs of overlying landowners requiring water for use on their overlying lands for other than agricultural needs, or it may be extinguished or limited if it be shown that it has been wholly or in some ascertainable degree, lost by the accrual of adverse prescriptive rights impinging upon it. But, until such a diminution is made to appear, the existence in overlying landowners of reasonable needs for irrigation purposes of 126,617 acre-feet of water per annum and, therefore, of the initial right to take that amount each year is a *prima facie* showing that such right still remains unimpaired. (Code Civ. Proc., § 1963, subsec. 32.)

So far, then, as appellants claim that such right has been curtailed or extinguished, such claim amounts to an affirmative defense and it becomes their burden to plead and to prove it, although, indeed, if it appears in the evidence actually admitted such evidence may not be disregarded. Appellants have, to be sure, set up in their answers what they claim to be their own prescriptive rights and the city of Riverside has affirmatively pleaded those of the two companies that divert water below the Prado Dam. Appellants have not in their pleadings committed themselves as to what diminution in the rights of the overlying landowners in the District they claim has resulted from the creation of the prescriptive rights so pleaded, nor have they pleaded as diminishing such overlying rights any prescriptive rights, urban or otherwise, of appropriators within the respondent District itself. Counsel now

urge that all such prescriptive rights appearing in the evidence, that is, both the prescriptive rights of appellants themselves and those of others within the River System, if it is to be treated as a unit at all, must, from the very definition of prescription, be adverse to the rights of the overlying landowners. (*Pabst* v. *Finmand*, 190 Cal. 124, 128 [211 P. 11] and cases cited.) It is further urged that, since such prescriptive rights are adverse to the rights of the overlying landowners, the latter rights must, to the extent that they are thus adversely affected, be held to have been limited or extinguished. So far the position which counsel take is indisputable.

But the proof of a prescriptive right to a certain number of acre-feet in an appropriator does not mean that the same number of acre-feet must be deducted from the rights of the overlying landowners. Manifestly the extraction by appellant cities of the amounts which they are entitled to extract under their prescriptive rights will not have deprived the landowners in the District of anything like the same quantities of water. Much of the water used goes back in the underground strata. With the variable climatic conditions and the distance of transmission, the losses of water in the District Basin that such extractions above may from time to time cause are variable and incapable of exact measurement. Similarly any diminution caused by the use on the part of the two water companies referred to, of their prescriptive rights, may, while necessarily in some degree impinging on the rights of the overlying landowners have, by reason of the manner in which the water companies use these rights, actually worked a relatively small diminution of the overlying rights. So, too, with the use of their prescriptive rights by urban or other appropriators within the respondent District itself. The use of their rights in the manner in which it is done, though, as a matter of law, working some diminution of the rights of the overlying landowners, in actuality will almost never deprive the latter of water in the same amount quantitatively as the extractions of the appropriators.

Again, it is not to be assumed that, because the prescriptive right of an appropriator is adverse to that of the overlying landowner, that its adverse effect is necessarily to cut down the right of the landowner to water by any quantity at all. *Non constat* but that its effect may be merely to require him to go to a greater depth and incur greater expense in pumping the same quantity of water he had before. All this is well

illustrated by the circumstance that of the quantity of 126,617 acre-feet of water per annum to which the overlying land-owners in this case must be deemed to have been initially entitled, they were in 1954-1955, despite all the prescriptive uses by others, still able to pump not less than 108,485.2 acre-feet from beneath their holdings.

The only practical course for the trial court, in these circumstances, was the one in part actually taken. It proceeded to determine such prescriptive rights as the evidence established in appellant cities. These being found, are as a matter of law paramount to the rights of the overlying landowners in the District. The reasonable needs and, therefore, the rights of the latter, being subject to the adjudged prescriptive rights, must by necessary implication be deemed to have been adjudged to be diminished in whatever degree the exercise of the prescriptive rights found to exist may from time to time adversely affect them. To the extent that this result is lacking in certainty, such uncertainty is either inherent in the situation, or results from some failure on the part of the party seeking to have the extent of the diminution adjudicated to sustain his burden of showing the amount of diminution. We have said that in this case the only practicable course that the trial court could have taken was the one it did *in part* take. It did not complete the process to the extent that it might have done by availing itself of evidence in the record to adjudicate the prescriptive rights of those appropriators of water within the District, whose annual drafts of water, for a long time back have been shown and are even set out in the trial court's amended finding XIII. Even had it done so, however, it would not have eliminated the uncertainty as to whether the overlying landowners in the District have really suffered any diminution in the quantum of their rights or only in the ease and degree of the cheapness that they originally had the right to expect in exercising them, through the permanent lowering of their water table. To whatever extent any diminution of their rights, whether quantitatively or in the cost of their exercise, may have been caused or contributed to by the exercise on the part of appellants or anybody else of prescriptive rights, it is *damnum absque injuria,* but to such an extent as their rights have been infringed or their infringement proximately contributed to by the taking on appellants' part of water in excess of appellants' prescriptive rights, the infringement amounted to a trespass for which the responsibility rests

on appellants. Respondent does not complain, of course, of any lowering of the water table in the District consequent on the exercise by appellants of their prescriptive rights, but only of such lowering as it claims has resulted from the taking by appellants of water in excess of their prescriptive rights.

We have, then, to inquire whether appellants have suffered any actual prejudice from the trial court's failure to proceed as far as the evidence warranted in determining the extent of all prescriptive rights to water in the whole river system, including those of appropriators in the District and thereby, so far as the evidence permitted, marshalling the whole array of prescriptive rights by which the overlying rights of the landowners are restricted. As to that, we must conclude that, even with any findings that the evidence would have permitted the court to make on the subject, the uncertainty as to the nature and, if quantitative, the proportionate part, of the initial water rights of the overlying landowners that have been subtracted by the creation of said adverse prescriptive rights, would not have been removed, nor would the burden of appellants to remove the uncertainty, if, indeed, it were susceptible of removal at all, have been met. It is, therefore, our view that such additional findings, had they been made, would not have been of material assistance to appellants' defense and, therefore, that the failure to make them, however regrettable, did not amount to reversible error.

The second point made by counsel for the city of Riverside is, in substance, a reiteration of their contention, dealt with on the first appeal, to the effect that the drafts made by their city on the water of the river were not shown to have proximately caused or participated in causing the shortage in the District Basin of which the respondent complains and, indeed, they assert that the drafts made by them could not have done so. The question whether such drafts have actually done so was obviously one of fact for the determination of the trial court, except to the extent that the situation is dominated by physical conditions that are not open to doubt. The conclusion expressed in our original opinion that no mere temporary or occasional lowering of the water table in the San Bernardino Basin could, under the physical conditions prevailing, produce a simultaneous or substantially simultaneous lowering of the water table in the District Basin was, of course, intended to apply only to the finding of a close correspondence in time and amount between

deficiencies in the upper and lower stretches in the river system, our view being that only after a considerable interval could such a correspondence be felt. Obviously, as we think we made abundantly clear in our original opinion, what we said in that connection has no proper application to the case of a permanent lowering of the water table in the San Bernardino Basin or to a recurrent lowering of the water table there in dry years without adequate replacement in succeeding wet years, when permanently, or for like periods of long duration, there is a substantially parallel lowering of the water table in the District Basin. The trial court has found on evidence, which again, indeed, was conflicting, but which we have held sufficient, that below the San Bernardino Basin, the water of the river divides, part flowing through the Riverside Narrows and part percolating downward into a course lying to the north of the Jurupa Mountains, to unite again in the lower part of the Chino Basin above the Prado Dam. Such percolations would, in a measure, explain the considerable excess, noted in our original opinion (*Orange County Water Dist.* v. *City of Riverside*, 173 Cal.App.2d 137, 201 [343 P.2d 450]), in the river flows at the Prado Dam over those in the Riverside Narrows. We cannot say that, notwithstanding it must now be considered that a material part of the waters of the river do not flow through the Riverside Narrows at all, but so percolate, and in a state of nature have, perhaps for centuries, been so percolating, yet that the present diminution of such percolation through human agency, not merely at particular times but now persistent through long years, may not reasonably be inferred from a persistent and broadly consistent lowering of the water tables in both the San Bernardino and District Basins, coupled with the increased use of water above the area of percolation. In our former opinion (p. 211) we rejected the view that such an inference could properly be drawn from mere isolated or short time coincidences or that there was evidence of any substantial equality between the quantities of water produced by the appellants or any of them and the reduction in the flow of water to the District, or that the increased production of water by appellant Cities and the decrease in the proportion of the natural supply reaching the Prado Dam have been in any proper understanding of the term "concurrent." We went on, however, to say that:

"The trial court's error, in our view, was not in finding appellants' increasing use of water to be detrimental to the supply reaching the lower part of the river system, but in undertaking to find a practically exact correspondence between their extraction of water and the diminution of the flow to the district, a correspondence that is not within reasonable approximation shown to exist."

Manifestly, moreover, appellants' extraction of water at particular times and the permanent lowering of the water table in the San Bernardino Basin, the main source of supply, are not the same thing even though the one be in some degree the cause of the other, and the rejection of the claim that such extractions are concurrent with variations in the water table in the District argues nothing against the belief that broadly coincident and long-continued lowering of the water tables in San Bernardino and District Basins, accomplished in the long time view by constantly increasing extractions of water by appellant Cities, are related phenomena. Further discussion of the subject will be found in our original opinion (*Orange County Water Dist.* v. *City of Riverside,* 173 Cal. App.2d 137, 212-215 [343 P.2d 450]) and will not be here repeated. We are not, of course, discussing the degree of participation of the respective appellant Cities, or all of them together, as compared with other agencies, through using water in excess of their prescriptive rights, in the diminution of the downstream water supply, but only holding that, with the continuity found to exist between the upper and lower stretches of the river system, not merely through the Riverside Narrows but also through the Jurupa percolations, the general coincidence through extended periods of a greatly lowered water table in the District Basin with a greatly lowered water table in the San Bernardino Basin, plus the showing of sustained use of water in increasing amounts by appellant Cities amounted to evidence from which the trial court could reasonably have drawn the inference of a causal connection. It is impossible to say that it could not reasonably have drawn such an inference unless there are indisputable physical conditions to preclude it.

Counsel for the city of Riverside insist that such precluding physical conditions have been shown and that they do preclude the inference. They assert that:

"The sustained water levels in the Colton and Riverside-Arlington Basins and the sustained flow at Riverside Narrows

compel the conclusion that the outflow from the San Bernardino Basin has not diminished in the present dry period as compared to the previous dry period. Thus water appropriated by an appellant *could not* have caused a lowering of the water table in the District Basin.''

But the trial court by perfectly legitimate inferences from the long continued coincidence and magnitude of the shortages in the Upper and Lower Basins and the size of appellants' drafts found that, at least in some part, it did cause it and this court could have been justified in disputing the finding only if counsels' showing that it was impossible were pretty conclusive. But we think it was inconclusive.

Insofar as counsels' contention, which is the same that they made on the former hearing, has to do with the Colton and Riverside-Arlington Basins, the evidence relied on to support it was summarized in a footnote at page 21 of the Riverside reply brief on the former appeal, and consisted of the record of two wells in the Colton Basin and six in the Riverside-Arlington Basin, all of which with the exception of two in the latter basin did in fact show some, but a comparatively slight added depression of the water table in the present as distinguished from the previous dry period.

It was, however, not essential to respondent's case to show that in every basin from which water is being used there has been a noticeably added depression in the water table during the present dry cycle as distinguished from that in the last previous dry cycle. It must be remembered that the city of Colton does not get all of its water from the Colton Basin but reaches up into the Lytle Creek Basin above the Bunker Hill Dike for a substantial part of it and that the city of Riverside does not get its water solely from the Riverside-Arlington Basin but reaches up for a great part of it into the San Bernardino Basin and that it is in the San Bernardino Basin that the increased depression of water in the current dry cycle as distinguished from the last one is found to occur. Neither the cities of Colton nor Riverside depletes the basin on which it lies to anything like the full extent of its water use. As compared with the San Bernardino Basin, the Colton and Riverside-Arlington Basins are comparatively small. No evidence has been called to our attention of how far if at all beneath their surface the same semi-impermeable subterranean cap extends that exists beneath the surface of the San Bernardino Basin and which there retards the filling of voids

occasioned by pumping. To whatever extent such cap is absent in the Colton and Riverside-Arlington Basins its absence would necessarily facilitate the penetration of water into their lower strata so that voids would no sooner be created than their filling would begin, with the consequent maintenance in these basins of a more stable water table than in the San Bernardino Basin. For all we know, other conditions may exist not appearing in the evidence, such as variations in the drafts made by others than appellant Cities, working to the disadvantage of the San Bernardino Basin in the maintenance of its water table, as distinguished from the Colton and Riverside-Arlington Basins.

A somewhat more plausible support to counsels' position is given by the circumstance, commented upon in our original opinion, that the flow of water in the Riverside Narrows appears, during the time it has been under observation, to have exhibited no greater diminution in dry years than that which under the methods of calculation which we have accepted (*Orange County Water Dist.* v. *City of Riverside,* 173 Cal. App.2d 137, 205-211 [343 P.2d 450]), are reasonably attributable to the diminution in rainfall. Counsel now seek to extend the reasoning by which, in view of that circumstance, we concluded in our former opinion that extractions of water by appellant cities could not have been precisely reflected in concurrent or equivalent diminutions in the supply to the District Basin, so as to now require us to hold that they cannot be reflected in a diminished supply to the District at any time or at all. We decline to go that far. It is true that in the former opinion (p. 208) we said that ''the significance of the flow at the Narrows as an indicator of the extent to which climatic conditions, on the one hand, or drafts upon the basins above on the other, may have affected the total flow farther down, can be nullified only if it be believed that there has been a change in the *proportions* of the overflow from these upstream basins that respectively reach the Narrows or seep through to the north of the Jurupa Mountains, and that no reason exists for assuming generally, much less in dry years, that there is any substantial change in that proportion.'' We elsewhere observed that respondent's witness Bailey had suggested the proportion to be something like 50-50. What was thus said would obviously be correct as applied to short time periods but we would not be justified in so far extending this reasoning as to believe that on a long

time basis including both dry and wet years the same improbability of a change in the proportion between these flows would exist.

In course of the oral argument on the present appeal, counsel for respondent called attention to the testimony of the witness Bailey on this subject, appearing at pages 4617 and 4618 of the reporters' transcript at the original trial, made by stipulation a part of the record on the present appeal. The testimony referred to is as follows:

"Q. Now going back for a moment to the division of the underflow that passes through the Bunker Hill Dike, that is the division between the portion that goes down and follows the general direction of the trunk channel of the Santa Ana River, as compared with the portion that you have testified goes around the north of the Jurupa Mountains, can you tell me if the height of the water level in the San Bernardino Basin would be one of the conditions which would affect the amount of proportions of those flows, in other words, if the level of the basin were raised or lowered, would it have any effect upon the division of the underflow between that which follows the trunk channel of the Santa Ana River and that which follows around the north of the Jurupa Mountains? ...A. Yes.

"Q. And what would the effect be, generally? A. Generally speaking, the higher the water level in the upper basin above the dike, the more outflow through the dike there would be, or, if those levels recede, generally speaking, the less would be the flow through the dike, other things being equal. The reduction of flow through the dike would be taken up, in part, by the division of flow going north of Jurupa Mountains and following the course of the surface channel, the greater— the somewhat greater deduction would be expected from that going north from the Jurupa Mountains."

In other words, according to this witness, in a good water year favorably affecting the flow through the dike, a greater proportion of the divided flow below the dike would percolate north of the Jurupa Mountains and in a dry year that percolation would be the one to suffer the greater deduction. That this account of the matter is not unreasonable would seem even clearer from the circumstance that, if, as the trial court found, there is such a division of the flow, such division must occur far above the Riverside Narrows, and, therefore, the

volume of the stream before reaching the Narrows has from time to time been already reduced accordingly.

*In fine,* we cannot accede to counsel's argument that the physical conditions necessarily preclude the trial court's determination that appellants' use of water has contributed as a proximate cause to the deficiency in the District Basin.

As respects counsel's more specific objection based on the circumstance above dealt with that there are wells in the Colton and Riverside-Arlington Basins in which the water level does not appear to have been more than seasonably lowered, to so much of the trial court's amended finding XIV as determines that "The use of the water by the defendants *tends* substantially to reduce the average level in the water table both in the upper" (San Bernardino) "basin and in all lower reaches of the Santa Ana River," etc., we are unable to see that the finding is objectionable. The language quoted refers to a general tendency not necessarily to the effect on specific areas and, moreover, whatever the levels of water from time to time in the Colton and Riverside-Arlington Basins, it cannot be denied that whatever water is taken from them by appellants, the cities of Colton and Riverside must *tend* to diminish the flow or percolation when it reaches these basins to areas below them.

There has been a great deal of discussion in the briefs in this case, including the briefs from the city of Riverside, on the present appeal, about the effect of the diversions of water from the San Bernardino Basin on the outflow therefrom in the gap in the Bunker Hill Dike, and as to how much, if at all, the proportion between the inflow into that basin and the outflow from it have been changed by such diversions. There have been measurements of the surface flow across the gap by gauges maintained there. There have been no measurements of the important underground flows and percolations through the large amount of permeable material above the bedrock constituting the lip of the gap, all that can be said with certainty being that they are known to have been very large. How much they have varied from time to time or what diminution they may have suffered is a matter of debate. (*Orange County Water Dist.* v. *City of Riverside,* 173 Cal. App.2d 137, 212 [343 P.2d 450].) As we there said: "The relation between the drafts on a basin at a given time and the flow from it, then or within any exactly measurable time thereafter, is not very susceptible of quantitative statement."

Counsel for the city of Riverside, however, undertake to show how it would be possible for drafts to be made on the water of the San Bernardino Basin (Opening Brief on the present appeal, pp. 32, 33) without diminishing the outflow from the basin. There is no dispute about the general topographical conditions which they there depict, which are the same described by the Supreme Court in *City of San Bernardino* v. *City of Riverside*, 186 Cal. 7, 11-12 [198 P. 784], quoted in our original opinion in this case (p. 159) and dealt with as to the same matters which counsel now discuss at pages 212, 213 and 214 of that opinion, to which we here refer. Counsel's criticism of the evidentiary importance of the lowered water in the Williams well, referred to in the findings because its level in the present dry period is higher than the ground level at the gap in the Bunker Hill Dike and higher still than the underground lip of the dike is unimportant, because, as we pointed out in our former opinion (p. 213) the picture presented by the Williams well is presented also by a large number of wells selected from points all over the basin. No one questions the fact that, in view of the existence of a partially impervious cap beneath the surface of the San Bernardino Basin, and in view of the downward slope of that basin and the hydraulic grade of the water table therein, it is possible by pumping to create voids of considerable extent in the underground water of the basin without in a corresponding degree affecting the outflow in the Bunker Hill Dike. Counsel's thesis that the creation of such voids has not thus far affected such outflow at all is no more than an expression of opinion. The further implication of their argument that the creation of such unreplenished voids can be permitted to go on and increase indefinitely without prejudice to the whole water supply of the river system below the San Bernardino Basin, or even without prejudice to that of the basin itself is wholly untenable.

In further pursuit of their thesis that appellants' use of water has been no part of the proximate cause of any shortage in the district, counsel for the city of Riverside complain that:

"The trial court committed prejudicial error (1) in failing to find that the extractions of water from the District basin by appropriators including prescriptive title owners have been a cause of the purported overdrafts and the decreased water table therein, and (2) in failing to find the extent to which

such extracts have contributed to such overdrafts and have so decreased the water table.''

We do not know what utility to appellants such a finding would have had, if made. The only utility that could be claimed for it would be either (1) to aid appellants in their effort to show that the overlying landowners have lost all or some of the rights they claim, or (2) to aid appellants in their denial that their own use of water has been a proximate cause of the shortage in the District. Certainly the finding to which counsel claim to be entitled, of the aggregate extractions of water by appropriators in the District, both under prescriptive rights, beyond prescriptive rights, and under no rights at all, would not serve the first of these purposes. Indeed as we have hereinbefore been at pains to show, even had such a finding been confined to the extractions made in the District under prescriptive rights, it would have been futile to effect that purpose. It is equally clear that the finding to which counsel claim to have been entitled would have been equally futile to serve the second purpose mentioned. This can be easily shown. Throughout this case it has been beyond dispute that the Santa Ana River is the main source of water for the District as well as the other areas involved. The tabulation, plaintiff's Exhibit 59, received in evidence at the original trial, graphically shows that. It is a computation of the long term, mean, annual runoff in acre-feet resulting from precipitation over the various areas included in the general region involved in this case for the period 1894-1895 to 1946-1947—that is, before the decrease resulting from the present dry cycle. The aggregate runoff for all parts of the region not tributary to the river above Prado Dam—that is the aggregate resulting from rainfall not only on the valley floor, which includes the District, but also from mountains, hills and other areas which make their contributions either directly by creeks or by outflow into the river itself below the dam, was 23,894.85 acre-feet. Obviously under present drought conditions it is less. In its original finding XIII and again in its amended finding of the same number, the trial court found that in 1955 (actually 1954-1955), the last year for which figures were available at the trial, the overdraft in the District as compared with the needs of the overlying landowners for agricultural purposes exceeded 77,000 acre-feet, without taking into account other overlying areas or the needs of others within respondent District. In referring to this finding we, in our original opin-

ion (*Orange County Water Dist.* v. *City of Riverside,* 173 Cal. App.2d 137, 185-187 [343 P.2d 450]), quoted, as essentially correct the statement of respondent's counsel in the former hearing that "The figure of 77,000 acre feet is computed by subtracting the total natural flow of the river, 49,180 acre feet at Prado Dam . . . from 126,617 acre feet, the irrigation requirement for overlying agricultural lands in the District established by Exhibit 5B, the difference is 77,437 acre feet." Even if we were to assume that the 23,894.85 acre-feet remained undiminished in 1955 and were to add that to the 49,180 acre-feet of low at the Prado Dam, the aggregate would amount only to a fraction less than 73,075 acre-feet which if deducted from the 126,617 acre-foot requirement of the overlying landowners for irrigation, would still leave a deficiency of 53,542 acre-feet in the amount needed to satisfy the agricultural requirements of such overlying landowners alone (a deficiency, by the way, largely exceeding the aggregate of all the water appellant Cities together are entitled to take under their adjudged prescription rights). Since this deficiency would exist before any extraction by appropriators within the District were taken into consideration at all, it is manifest that no finding of the amount of their extractions could possibly change the picture by showing them to be responsible for the shortage and thus exculpating appellants from responsibility therefor. (We note a slight discrepancy between respondent's counsel's figure of 49,180 acre-feet for the natural flow of the river at Prado Dam and the 49,193 acre-foot figure given in the San Bernardino-Colton tabulation, Exhibit AL 83, but the variation is too slight to have any importance.) It is true, indeed, that the flow at Prado Dam was in the particular year 1954-1955 lower than it had been in some other recent years, but in only one year since 1947 had it exceeded 60,000 acre-feet.

▆▆▆ The contention that appellants are not to be charged with impairing the water supply in the District because of drafts on that supply by water users within the District *represented by respondent,* is without merit. It is true that we expressed ourselves in our original opinion (p. 188) as not satisfied "that there has been no excess within the district in the use of water nor in drafts there upon the underground water supply." We also there noted, however, that it was clear that neither the overlying landowners who require 126,617 acre-feet of water per annum for irrigation, nor the

interested water companies who were entitled to their supplies by prescription, have been acting beyond their rights. Even if other water users within the District and represented by it are doing so, it would in no wise estop the District from seeking relief in this action for those represented by it who are themselves acting within their rights and not *in pari delicto* with those who are exceeding their rights.

We have at some length examined the points made on behalf of the city of Riverside, insofar as they go to the essential sufficiency of respondent's showing to make a case, either against that appellant or against appellants generally, or insofar as they question the essential correctness of the decision reached by us on the former appeal and unchanged by the Supreme Court. Our conclusion that our former decision was essentially right makes it unnecessary to pursue the discussion in the briefs of the doctrine of the law of the case to determine how far, if at all, it controls our present action or precludes the city of Riverside from disputing respondent's right to all or any of the relief that has been awarded to it.

We will not repeat here what was said in our original opinion (p. 216) on the subject of irreparable damage. Neither will we engage here in a discussion of the degree of benefit to accrue to the overlying landowners in the District from the injunction sought.

We proceed now to the discussion of various contentions of appellants not affecting the right of the respondent to any relief at all but only to certain features of such relief. In the further course of this opinion we shall be considering not the points made in behalf of the city of Riverside only but those also made for the cities of San Bernardino, Redlands and Colton.

■ The first complaint made by the last named cities and embraced also in the third point made in the opening brief for the city of Riverside in the present appeal is, in substance, that both the amended findings, conclusions of law and judgment, contain provisions resulting in the award of relief to parties who are on no tenable theory entitled thereto, that is, according to appellants, to parties other than to the overlying landowners within the district who use their lands for agricultural purposes.

In one of its briefs on the present appeal counsel for respondent insists that objections of that character are foreclosed by our former decision and by *Coachella Valley County Water Dist.* v. *Stevens,* 206 Cal. 400 [274 P. 538], on the

authority of which we there largely relied, and by the illustration that, in our former opinion we used, of the State of California's right to represent the innumerable water interests involved in the Colorado River controversy without particularizing them, even though the state might have had no proprietary right in a drop of the flow. We adhere to all that we there said but do not agree that it forecloses the complaints of appellant Cities now under discussion. On the former appeal it was decided that a cause of action had been stated, without the necessity of specifying the individual water rights in behalf of which the District was suing. From that view we are not departing. It was further held competent under the general allegations of the complaint for the District to introduce evidence of the quantum of the needs of the overlying landowners as evidencing the extent of their rights. From that view we do not depart. We go further and say that under the complaint, as drawn, counsel might have gone as far as they chose in introducing the evidence of the prescriptive rights of the cities within the District and of others using water within the District such as the companies taking water below the Prado Dam, and, indeed, of any or all water users within the District having any water rights. We concede that it would have been sufficient for respondent to have proved, if that could have been done, the quantitative aggregate of all such rights, or of all or any classes thereof. We freely concede that the District has from the beginning been representing, in this action, not only the overlying landowners but all water users within the District having any water rights to be represented, by choosing "to depend on the proof of the need for water and the right to said water by the overlying landowners only, and the damage to these overlying landowners caused by the overproduction of defendant cities, to justify the relief asked for."

In all of this we have accorded full recognition to respondent's status as a public corporation and its right to represent those whom the statute authorizes it to represent. We, moreover, have gone as far as either the Coachella case or the example of the course of the State of California in the Colorado River controversy requires us to go. In contrast to the situation in the Coachella case and to the Government's position in the Colorado River controversy, respondent's counsel have here declined to commit themselves, even as to the aggregate quantum of the water rights that they are seeking to

establish, except in the instance of the overlying property owners only. Curiously enough, although the position of respondent's counsel with respect to the others represented by the District was frequently enough mentioned in the record and on the former hearing in this court, there was on the former hearing here no real discussion of the merits of the position taken and it is for the first time actually argued before us now. The only mention of the subject in our former opinion was as a mere recital of respondent's position and of the trial court's characterization thereof, to wit: that respondent was pressing for a judgment in favor of the overlying landowners and incidentally seeking whatever benefits to the others, represented by it, might result from such judgment.

What we are now discussing is to what extent, if at all, it can benefit them. None of the positions that we have taken, and have just summarized, require us to hold that when, in its representation of water users within the District, respondent has seen fit not to follow through, nor establish even the aggregate of the water rights that it represents, or of more than one single class of them, it may still invoke in behalf of all of them injunctive relief. There must be some limit to uncertainty, and specifically to uncertainty in the nature and extent of rights sought to be enforced. Appellants' objections to certain of the amended findings, conclusions of law and certain provisions of the amended judgment raise questions which remain open for discussion. To whom does the benefit of the judgment here to be awarded as a matter of law enure? The answer would seem to be, to those whose rights now found to be infringed, have been at least in some sort, prima facie or otherwise measured and defined. They should not enure to those whose rights have, not from necessity of the case but *ex industria* been left without any quantitative determination or definition, even though they continue to be represented by respondent in the action. They are merely in the same position as parties who have seen fit not to complete their case. We do not feel justified in going so far as to hold such parties entitled to the technical benefits of the judgment. So far as parties are concerned, the District must be, of necessity, the actor, though it has no proprietary rights.

Actually, however, the problem presented by the objections just discussed, of appellant Cities, while of considerable theoretical importance, is of little, if any, practical moment. This is true because, so long as the adjudged rights of the over-

lying landowners, or any considerable number of them, continue, and so long as respondent District insists upon their enforcement, no water in excess of their adjudged rights can be lawfully extracted from the river system by appellant Cities, or be prevented from flowing downstream for the use of whoever actually has a right to use it, whether technically a beneficiary of the judgment here or not. Though it be, therefore, not a legal advantage but in the nature of a windfall, whoever in the District has any actual water rights will, without being mentioned in the judgment, share in any benefit that may result from it. However, regardless of that, the amended findings, conclusions of law and judgment should be so corrected as to conform to the view of the law that we have just expressed.

We proceed, now, to examine the several paragraphs of the amended findings, conclusions of law and judgment, in their numerical order, to consider what changes these require.

Some of these findings are the result of specific determinations made by this court on the former appeal in discussing the sufficiency of the evidence to sustain the former findings. We wish to make it clear, however, that we do not consider ourselves bound to refrain from dealing with particulars in which the amended findings may go beyond the evidence required to support them or are otherwise objectionable, merely because they may be repetitions of original findings which we did not in our former opinion specifically disapprove.

There is nothing in any of the findings I to V, both inclusive, that calls for any comment.

Finding VI, which is a reappearance of the original finding of the same number and in the same language, is technically incorrect in its assertion that "all water in the Upper and Middle Basins," if not artificially diverted or extracted, would naturally and normally reach the channel of the Santa Ana River and ultimately arrive at Prado Dam. It fails to take account of losses of water by evaporation, transpiration or possible disappearance in other directions while in the course of percolation. This finding should be corrected accordingly.

We do not think, however, that finding VII as it now stands is objectionable. By "natural and normal flow" as there used, is to be understood whatever flow would, but for the interference by man, have reached the District Basin after allowing for losses due purely to natural causes.

Findings VIII, IX, X and XI require no comment.

We cannot agree with appellants' criticism of finding XII. Appellants' counsel overlook the distinction between a short time and a long time view of the situation. They also overlook the distinction between a concurrent or coincident lowering of the water tables in the San Bernardino and District Basins, which, broadly speaking, have occurred, and the traceable reflection of particular withdrawals of water in the San Bernardino Basin in particular lowerings of water in the District Basin, which have not occurred. It was the assertion of the last-mentioned concurrence, not the former, which we criticized in our former opinion. As we have, in the present opinion, already pointed out, particular withdrawals of water are one thing and the general lowering of the water table another, although manifestly the former, if sufficiently drastic or often enough repeated, may be a cause of the latter. The present finding XII does not assert a substantial equality or any equality at all between the amounts of water produced by appellants and the lowering of the water table in the District. It neither asserts nor implies that appellants' withdrawals of water have been the *sole* cause of the lowering of water tables in the San Bernardino Basin. The criticism of the finding as in conflict with our original opinion is wholly unfounded. We think, however, that in place of the word "overdraft," as used in this finding, the word "shortage" would be more correct.

We see no occasion to disturb finding XIII except to say that wherever the word "overdraft" appears therein the word "shortage" had best be substituted. If it contains matter not necessary to the decision of the case, that furnishes no ground for our interference with it. It is not our function to disturb findings for mere redundancy or even for assertion of mathematical impossibilities. To justify our disturbing them it must appear that they contain matter erroneously prejudicial to the party objecting to them or omit matter which he is entitled to have incorporated in them.

While the addition requested by the cities of San Bernardino, Colton and Redlands to finding XIV would not have been improper, we cannot say that, if made, it would have effected any substantial change in appellants' position or, in the circumstance, that its refusal was error.

We are thus brought to finding XV. There is no merit in the contention that under our former decision the trial court was required to fix the prescriptive right of the city of San

Bernardino at 14,751.59 acre-feet of water per annum instead of 14,625.01 acre-feet as it was actually fixed in finding XV, in the conclusion of law I, and in paragraph IV of the judgment. What we said on this subject in our original opinion was merely illustrative of the proposition, laid down by the cases cited in its support, that if, during some year or years intermediate between the first and the last of the five years of continuous adverse use required to establish a prescriptive right, the use actually falls to a figure less than that of either the first or the last year of the period, such drop need not necessarily be treated as limiting the prescriptive right gained to the quantity used so as to confine it to that used in the intermediate year of lowest use. Whether in the circumstances of a given case such drop is to be treated as such limitation is a question for the trial court, and the trial court having here applied the limitation, we do not feel called upon to disturb the exercise of its discretion in the matter.

More seriously, it is contended on behalf of the city of Redlands that the trial court erred in fixing the total of its prescriptive right at 12,191.23 acre-feet per annum, instead of 13,943.23 acre-feet per annum. The difference amounts to 1,752 acre-feet.

In the upbuilding of its water system and through a long period of years, the city of Redlands has been acquiring wells, water-producing plants, pumps, facilities and water rights from numerous individuals and corporations and, instead of paying for them in money, has compensated the former owners, known in the record as "prior right" holders, by entering into contracts with them to furnish them with quantities of water. The aggregate of the quantities so agreed to be furnished is 1,752 acre-feet per annum. The water so supplied is not derived specifically from their former properties but is drawn from the general supply of the city without regard to the place of origin and in producing it the city exercises prescriptive rights. Many of the "prior right" holders use this water supplied them in part for agricultural uses. In determining, in this case, the measure of the city's general prescriptive right to produce water, the trial court excluded this 1,752 acre-feet and held that, although the city is entitled to continue to produce it for delivery to the "prior right" holders, the city may use it for no other purpose and that it is not presently used for municipal purposes and is no part of the water to be included in the city's general prescriptive right.

We think that it is. There is no showing that these acquisitions by the city from these "prior right" holders were in any manner unlawful, or that the mingling of the water since derived from their former facilities with other water of the city, or the change in the places of its use of the use of any of it has injured anyone. The 1,752 acre-feet per annum involved should have been included in the city's general prescriptive right to produce and use water, the measure of the city's general prescriptive right increased accordingly and the restriction imposed by the trial court on the use of this water removed.

Respondent calls attention to the circumstance that in the original findings and judgment the trial court treated this 1,752 acre-feet of water in the same manner in which it is treated in the amended findings and judgment and that this court directed no change therein. That circumstance need not preclude us from directing the change now that the subject is called to our attention.

We have sufficiently discussed finding XV insofar as it determines the measure of the prescriptive rights of appellants. As to its reference to the quantities of water used by the cities of Redlands and Colton since the complaint in this action was filed we think that, in its amended form, the finding sufficiently meets the criticism which, in our former opinion, we made of it as originally framed.

Objection is made to the language contained in finding XVI to the effect that the "drafts on the upper basins of the river system by the defendants and each of them adversely affect long-term sufficiency of the water supply all the way down the river." It is asserted that "Under the evidence and the opinion of this court, the finding should specify that it is 'the aggregate drafts' which adversely affect the sufficiency of the supply." But an aggregate consists of the units which compose it and to the extent that substantial drafts on the part of appellants contribute to an aggregate which adversely affects the supply, they also adversely affect the supply. The fact that an aggregate of several factors contributes to a result does not make any one of them any the less a contributor.

Specifically, however, we think that the second paragraph of the finding XVI should be so corrected as to apply to the need for water only of the overlying landowners, for irrigation. We think also that, as suggested in one of the briefs, the statement in the findings of such need should be coupled with

the statement of the right of the overlying landowners to the water required to satisfy such need.

Further, we think that the third paragraph of the same finding should be so corrected as to confine the mention of the parties damaged by appellants' taking of excess amounts of water to the overlying landowners within the District using their lands for agricultural purposes.

Finding XVII requires no comment.

Complaint is made of insufficiency of finding XVIII, to the effect that "The plaintiff has not been guilty of laches so as to bar this suit." This may be misleading. It should read: "The plaintiff has not been guilty of such laches as to bar this suit." It is claimed that the finding should be so amplified as to set out the particulars of laches on respondent's part which we held sufficient to justify the moratorium that, on the hearing of the original appeal, we held should be granted. Most of the facts, however, which justify the moratorium either appear elsewhere in the findings or may be ascertained from the pleadings or are matters of which judicial notice is taken. We do not see the need of amplifying this finding.

Finding XIX in its present form is not objectionable.

Insofar as we have determined that changes are required in the amended findings, the amended conclusions of law and the amended judgment should be made to conform with the findings as finally to be framed.

The first conclusion of law, as it now stands, should be so changed as to remove its recognition of a restriction on the future use by the city of Redlands of the 1,752 acre-feet of water hereinbefore in this opinion discussed. The same conclusion of law, after reciting the quanta of the prescriptive rights of the several appellants, goes on to say that: "Said quantities of water are exclusive of such quantities of water as said defendants are entitled to receive through mutual water companies."

This sentence should be so broadened as to apply to the future as well as the present and to include not only the water that appellants are presently entitled to receive from mutual water companies, but water which appellants shall at any time be entitled lawfully to receive from any source not involving any interference with the rights of the overlying landowners in respondent District.

The conclusion of law II is altogether too sweeping and, so far as the paramount rights therein mentioned are concerned,

should, in pursuance of what we have hereinbefore said, be limited to the paramount "rights of the overlying landowners within the plaintiff District, and of the District *as their representative,* to the natural water supply of the Santa Ana River system for agricultural uses on their overlying lands."

In the amended conclusion of law III there should be inserted after the word "District" the words "as the representative of the overlying landowners within it."

The amended conclusion of law IV deals with the subject of costs.

As respects the matter of costs, we cannot approve the action of the trial court. At the original trial the parties desired a daily transcript and stipulated that they should share its cost as they went along, that the sum any particular party might pay should be taxed as costs, and that the transcript might be available to either party for use as a transcript on appeal. Thereupon the trial judge remarked that its cost would in the long run be taxed in favor of the *prevailing* party. The transcript was made and used by appellants on the original appeal. On this appeal the judgment was reversed but no party prevailed to the extent of its contentions. In these circumstances, believing the interests of justice to require the exercise of the authority vested in us by subdivision (a) of rule 26 of the Rules on Appeal, we apportioned the cost of the transcript, treating it as a transcript on appeal, directing that respondent pay half of the cost of preparing it and appellants the other half in the proportion in which they contributed to its preparation cost. We know of no reason why the trial court should not have followed our direction.

Furthermore, believing it in the interests of justice, we now direct that the costs of the present appeal be also apportioned between the respective parties in the same proportion in which we directed on the former appeal that the cost of the transcript be shared. This conclusion of law IV should be altered accordingly.

We now come to the amended judgment.

The opening recital should, of course, be so amplified as to recite the proceedings taken on the present appeal.

Paragraphs I to IV, inclusive, require no changes.

Paragraph V should be corrected in pursuance of what we have said in discussing finding XV and all restriction on the use by the city of Redlands of the 1,752 acre-feet of water involved should be removed.

Paragraph VI should be changed to read substantially as follows: "Except as provided in Paragraphs IX and X hereof, the rights of the overlying owners in plaintiff District to the natural water supply of the Santa Ana River system for use for agricultural purposes are prior, paramount and superior to any right or rights as of the date of this judgment of the defendants and each of them to take, pump, divert or appropriate water from the Santa Ana River watershed in excess of the respective amounts set forth in Paragraphs II, III, IV and V hereinabove."

Paragraphs VII and VIII are unobjectionable.

We see no objection to the reservation contained in paragraph IX for reservation of jurisdiction in the court to determine the amount of water reasonably required for beneficial use on riparian or overlying lands belonging to appellants or any of them.

Paragraph X is defective in failing to provide for the case of possible acquisition by appellants not only of additional water from parties having prescriptive rights thereto but, also, for any lawful acquisition on their part of additional water rights. Such a provision would be in accord with the Supreme Court's ruling in *City of San Bernardino* v. *City of Riverside,* 186 Cal. 7 [198 P. 784], cited by respondent's counsel, that: "The judgment should not make any declaration of the right of any party to take in the future any water to which it has no present right."

The inclusion of such a provision would not be an advance approval of any such acquisition. It would, in the circumstances here, merely except it, if not itself unlawful, from the prohibitive provisions of the injunction, and avoid the implication that it was forbidden by the injunction itself. We do not say that the particular wording of the provision suggested by counsel for the cities of San Bernardino, Colton and Redlands as a substitute should be used, or that the acquisition by "condemnation" need be singled out for mention as a possible means of acquisition of such additional rights, but we do think that some language that would avoid the implication referred to should be employed.

As respects section or paragraph XI, we see no point in the objection by the city of Riverside to having the so-called "policing" provision of the judgment made applicable to its exercise of its riparian and overlying rights or to such

water rights as it may hereafter lawfully acquire. The exemption of these rights from the scope of the injunction to be granted is not a dismissal of the city from the case as far as they are concerned nor a relinquishment of jurisdiction as counsel appear to claim, to require their exercise to be reasonable.

The so-called ''policing'' provisions contained in section XI require the rendition by appellants to respondent of quarterly reports of appellants' extraction of water, the source of the same, and the identification of the facilities used, and also the opening of appellants' books to respondent's inspection at reasonable times. We think that, so far as the reports are concerned, they should be required to be made to the superior court rather than to respondent. The city of Riverside complains, as we think with justice, of the requirement that these reports be made quarterly. Since the whole record shows that water statistics are commonly kept on an annual basis, to require the city's books to be so altered as to set them up on a quarterly basis would be unduly burdensome. There is no finding on which any necessity for making the report quarterly can be determined, nor are we to assume any disposition on the part of appellant Cities to violate the injunction to be granted. In these circumstances it seems to us sufficient to require the reports to be made annually and that the requirement should be changed accordingly.

As respects the insistence that the judgment should further require that all producers of water within the District, including specifically the overlying landowners, be required by the District to install measuring devices on their water-producing facilities, we see no occasion for the inclusion of such a requirement in the judgment since it is, for the most part, already made of the water producers by statute now in force and a penalty there provided for disregarding it. (Stats. 1959, ch. 639, p. 2620, § 6 amending § 35 of the Orange County Water District Act.)

Section 29 of the act as amended in 1959, requires semiannual verified reports to the District by each operator of a water-producing facility within it of the water produced by such facility. (Stats. 1959, ch. 639, p. 2619.)

Since appellant Cities are compelled to furnish water production information to the court and to keep their books open for inspection, then ordinary fairness requires that respondent District, likewise, should reasonably reciprocate. The Orange

County Water District Act (Stats. 1953, ch. 770, p. 2064, and amendments thereto) has made provision for the accumulation of annual information on water production in the District. At least, the District should be required to furnish the court with a copy of the annual record entitled "The Record of Water Production," in the form required by section 31 of said Orange County Water District Act, and to allow the books and records of respondent District relating to water production and use, including the semiannual verified reports to the District by each operator of a water-producing facility within it of the water produced by such facility, to be inspected by the authorized representatives of appellant Cities at all reasonable times.

We see no occasion, however, for making these requirements conditions to the effectiveness of the injunction to be awarded. It would be time enough, under the reserved powers of the court, to provide such drastic action should it be made to appear that the information required was not in fact being given. We must assume that public corporations, such as the parties to this action, will comply with the judgment of this court, until the contrary appears.

Paragraph XII of the judgment requires no change.

Paragraph XIII of the judgment should be altered in its entirety to dispose of the costs on the two appeals in this action in accordance with what we have said in discussing conclusion of law IV.

In our opinion in the first appeal we disapproved the provision of the original judgment requiring appellants to compensate respondent District for excess withdrawals of water therein referred to. We note with approval that no such provisions appear in this amended judgment now under review.

We do not think it necessary to comply with the request of certain of the appellants, to use the exceptional procedure authorized by section 956a of the Code of Civil Procedure, by making new findings and conclusions of law ourselves and entering a judgment in accordance therewith. With the somewhat specific criticisms that we have made of the amended findings, conclusions of law, and judgment, as the same now appear, the superior court should have no difficulty in performing that duty.

The amended judgment is reversed and the superior court directed to so revise its findings and conclusions of law as to

bring them into conformity with the views which we have herein expressed, and to enter a second amended judgment accordingly.

Judgment reversed.

Griffin, P. J., and Shepard, J., concurred.

Petitions for a rehearing were denied February 20, 1961, and the opinion was modified to read as printed above. The petitions of appellant City of Riverside and of the respondent for a hearing by the Supreme Court were denied April 19, 1961.